In the Interest of BLD and BRD, Children










WITHDRAWN
7/18/2001




IN THE
TENTH COURT OF APPEALS
 

No. 10-99-335-CV

IN THE INTEREST
OF B.L.D. AND B.R.D., CHILDREN

 

From the 19th District Court
McLennan County, Texas
Trial Court # 98-0616-1
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                 
      This is an appeal from the termination of the parental rights of Spring and Jimmy Dossey over
two of their three children, B.L.D. and B.R.D. A third child was born during the course of these
proceedings and was placed with a friend shortly after birth. That child is not a subject of this
case. Spring and Jimmy appeal on multiple points of error. Because we believe Spring and Jimmy
were not effectively represented at trial due to a conflict of interest caused by their having a single
court-appointed lawyer, and because the construction of the charge deprives them of their right
to a verdict by at least ten or more jurors, we will reverse for a new trial.
FACTUAL AND PROCEDURAL BACKGROUND
      Before the events in this case, Spring’s and Jimmy’s only contact with the Texas Department
of Protective and Regulatory Services - Child Protective Services (“CPS”) was in 1995 just after
their first child, B.L.D., was born. Spring, age eighteen, was taking her thirteen-year-old brother
to school. At the car her brother realized he had forgotten his school books. Spring set B.L.D.,
who was in his car-seat carrier, on the trunk of the car and went back to retrieve the books. Her
brother got into the car and slammed his door, causing B.L.D. to fall off the trunk. B.L.D.’s
skull was fractured, but he fully recovered. CPS investigated and found the incident to be an
accident.
      On February 23, 1998, Spring and Jimmy had been living in a rented trailer home for about
two weeks. With them were their two sons, B.L.D., age three, and B.R.D., age one-and-a-half. 
Spring was seven-and-a-half months pregnant with their third child. Jimmy, age twenty-one,
rarely worked because he had a serious heart disease and a pacemaker.


 During the course of these
proceedings he was placed on social security disability. Spring, also age twenty-one, often worked
two jobs to make ends meet.
      The morning of February 23 Jimmy took Spring to the emergency room because she was
suffering from a painful ear infection. “Wicks” were put in her ears and medication was
prescribed. Once home, Spring, groggy from lack of sleep and medication, lay down to rest and
took B.R.D. with her. Jimmy and B.L.D. were outside. Spring told authorities she was
awakened by B.R.D.’s cries. She found him on the kitchen counter-top at the sink. He had been
seriously scalded on his right foot. Testimony at trial was that the hot water coming from the tap
in the trailer was heated to 180° instead of the normal 115° to 120°. Spring called out to Jimmy,
and they took B.R.D. to the emergency room. Nurse Duncum, a treating nurse at the hospital,
was suspicious of the injuries because of the pattern of the scalding which she thought was
inconsistent with an accidental event. She called CPS which sent personnel to the hospital. Both
boys were taken into custody by CPS.
      Initially Spring told authorities she knew nothing about how the injury occurred. Later, after
failing a polygraph test, she admitted that she heard B.R.D. making playful noises and found he
had pulled a chair to the sink and was playing in the water. Trial testimony from several witnesses
including CPS workers was that at the time B.R.D. was rambunctious and “a climber.” Spring
turned off only the cold water tap, not realizing the hot water was also on, and briefly turned her
back. B.R.D.’s foot made contact with the 180° water and he was scalded. Spring said she
initially lied because, with her background of being sexually abused by her father, she thought she
might be suspected of abuse. Criminal charges were later brought against Spring for the injury,
but she was never indicted. The CPS agent who had primary oversight for the case, Ms.
Sheffield, testified at trial she thought the injury was accidental. She said that had CPS believed
there was an intentionally-inflicted serious injury, CPS would never have recommended, as it did
later, reunification of the family. B.R.D. fully recovered from the scalding.
      The State instituted legal proceedings regarding custody,


 and a Plan of Service was
implemented. Jimmy and Spring had to undergo counseling and pay child support. Finances,
housing, and transportation were a continual problem. Also, CPS had a strong objection to the
children being around Spring’s father who had sexually molested her from ages seven to
seventeen, and who was currently involved in adult pornography. Spring took measures not to
associate with her father. Finally, Spring’s and Jimmy’s third child had been born and, with
CPS’s approval, was placed with their friend, Ms. Brewington. 
      In spite of these problems, at a status hearing on October 27, 1998, CPS suggested that by
February 1999, and regardless of the scalding incident, the conditions would probably be ripe for
returning the children. However, the trial court thought conditions had improved enough to order
B.L.D. and B.R.D. returned to Spring and Jimmy immediately. The family was reunited, but
housing continued to be troublesome. In late 1998, Jimmy, B.L.D., B.R.D., and the baby lived
for a number of weeks with Brewington and her family.
      On January 9, 1999, Jimmy stole a gun from his next-door neighbor’s house. He testified he
intended to sell it to get money for his family. He avoided prosecution by becoming an
undercover “buyer” for the Agriplex Drug Taskforce. Both of these pieces of evidence were
admitted at trial over objection.


 Meanwhile, by February 1999 Brewington was not cooperating
with Spring and Jimmy on their requests for overnight visitations with the baby. Instead,
Brewington called CPS and reported that when Spring and Jimmy were staying with her back in
the Fall of 1998, Brewington found a picture in the recycle bin of her computer of a “child”
engaged in sexual intercourse. The picture was admitted into evidence at trial.


 Through some
sleuth work of her own using the date and time the picture had been deleted to the recycle bin, she
suspected that Jimmy was the culprit who originally downloaded the picture from the internet.


 
Over objection, this evidence was introduced at trial. Brewington admitted at trial that her own
children and their friends viewed pornography on the computer, and that several other people had
access to it. After this accusation, CPS again took B.L.D. and B.R.D. into custody.
      Two additional incidents occurred shortly before trial. There was an altercation between
Spring and Jimmy in a Wal-Mart parking lot. Jimmy was charged with a Class C assault on
Spring for chasing and punching her. Over objection, this evidence was admitted at trial. In
addition, Jimmy failed two of his periodic drug tests, one for marijuana use and another for
methamphetamine use.
      About two months before trial Spring’s and Jimmy’s retained lawyer made a motion to
withdraw because Spring and Jimmy could no longer afford to pay him. Spring and Jimmy
requested the court to appoint that same lawyer to represent them. The court refused and
appointed another lawyer who then had two months to learn the case and prepare for trial. 
      The record from hearings that took place over the six to eight months before trial indicates
a growing concern on everyone’s part about the August 27, 1999, date which was approaching for
the State to either move for dismissal and possibly have to return the children, or proceed to a
termination trial. Tex. Fam. Code Ann. § 263.401 (Vernon Supp. 2001); see, e.g., In re Bishop,
8 S.W.3d 412, 418-19 (Tex. App.—Waco 1999, orig. proceeding). The case was tried to a jury
August 23-26, 1999. B.R.D. was now five years old, and B.L.D. was three years old. The State
called an array of witnesses including a psychologist, Dr. Shinder, who said the parental
relationships should be terminated. By a vote of ten to two, the jury found that Spring’s and
Jimmy’s parental rights should be terminated. 
      Spring and Jimmy bring eight issues on appeal.
      1.   Spring and Jimmy should have had separate court-appointed lawyers at trial. A conflict
of interest prevented a single lawyer from effectively representing them both.
      2.   Nurse Duncum was not qualified to testify as an expert about whether the scalding was
intentionally caused.
      3.   The evidence was legally and factually insufficient that Spring and Jimmy knowingly
placed or knowingly allowed the children to remain in conditions or surroundings which
endanger the physical or emotional well-being of the children.
      4.   The evidence was legally and factually insufficient that Spring and Jimmy engaged in
conduct or knowingly placed the children with persons who engaged in conduct which
endangers the physical or emotional well-being of the children.
      5.   Evidence of Jimmy’s alleged sexual misconduct and other bad acts was inadmissible.
      6.   There should have been specific questions asked of the jury about whether termination
was in the best interest of the children.
      7.   The jury should have been asked to decide separately which of the two statutory grounds
alleged for termination had occurred; the disjunctive charge and broad form questions
precluded this.
      8.   The Judgment improperly failed to include specific findings of the grounds for
termination.
We will consider the issues out of order, as necessary to dispose of the appeal.
ISSUE ONE: REPRESENTATION BY A SINGLE LAWYER
Background
      Spring and Jimmy initially hired a lawyer to represent them. That lawyer, Ray, worked on
the case from April 1998 to June 1999, when Spring and Jimmy ran out of money. They asked
the court for a court-appointed lawyer and for Ray to be appointed. Instead, the court appointed
Villarrial who was not previously involved with the case.
      At a hearing on August 17, 1999, a week before trial, Villarrial asked the court for separate
trials for Spring and Jimmy. He said: “[A]t this time it has come to my attention through reading
the record and talking to my clients that there is a potential for conflict of interest. . . . [T]he way
the testimony is going to come in and the way I anticipate the testimony to come in, I would ask
that this court sever Spring Dossey’s case from Jimmy Dossey’s case . . . so that I can adequately
represent one client at a time.” He added: “[You can] take the cases in any order you want. I
realize that we have a time limitation.” (Referring to the August 27, 1999, dismissal date). The
court immediately denied the request. Nevertheless, Villarrial called Spring and then Jimmy to
give testimony. 
      Spring said she was “very satisfied” with Villarrial’s representation of her so far. She
understood that “at some point [there might be] testimony . . . looking like some things might hurt
[her] because of what [Jimmy] did and some things might hurt [Jimmy] because of what [she]
did.” She said that Villarrial told her he thought he could represent both of them “to the best of
[his] ability” because Spring and Jimmy were “asking for substantially the same thing.” She said
she agreed to joint representation. Jimmy testified he was “greatly” satisfied with Villarrial’s
representation to date, and that he agreed to the joint representation and “waiv[ed] any conflict”
based on “what [Villarrial] explained about the conflict and substantially the same interest that [he]
and his wife [had].”
      At trial after the close of evidence and before final arguments, Villarrial reurged his motion
for separate trials. 
The reason I made that [pretrial] motion was, in part — well, actually the main reason and
the only reason I made that motion was because it became apparent to me at the time that I
was reviewing this case and reading the documents that an apparent conflict could arise . . .
and that if the line of testimony developed the way I thought that it would develop, that it
would, in fact, create a potential conflict. . . . [A]t that time . . . because [they] were both
asking for substantially the same thing, they were asking both to get their kids back, I thought
from a legal standpoint that a conflict . . . did not exist, but I stated at that time that I thought
there was a good chance that the way that the testimony was going to develop, that, in fact,
a conflict would be created between my clients. . . . As things have developed, I think it’s
apparent to everybody . . . that indeed a conflict has occurred in this trial, your Honor. . .
. With the exception of the burning of the feet which is what started this whole case,
everything has gone against Jimmy Dossey, a big portion of this, and because of that, if I
were representing one individual in this case, for example, Spring Dossey, my defense of
Spring Dossey would be to point the finger at Jimmy Dossey in this case and say, “You
terminate as to that guy because he has got a problem, but do not terminate as to Spring
Dossey,” and because of that, a conflict has arisen, Judge, and again I would have to move
that we sever this cause in order for Spring Dossey and Jimmy Dossey both to get a fair trial,
and I so do move at this time.

The court denied the motion.
      During closing argument, Villarrial skirted the issue by telling the jury that Spring and Jimmy
were not a “team” under the law, and reminding them that Spring testified she would leave Jimmy
if his rights were terminated but not hers.
      Spring and Jimmy complain on appeal that the trial court erred by failing to appoint separate
lawyers. Technically, their trial lawyer moved for separate trials, not for separate lawyers. 
However, since the intended result is the same under either motion, i.e., that Spring and Jimmy
each have a lawyer at trial who is in a position to advocate solely for her or him, we will treat the
issue as whether the representation of Spring and Jimmy at their trial by one lawyer denied them
effective representation of counsel.
      The State’s only response is that at the August 17 hearing Spring and Jimmy waived any
conflict from joint representation. The State further said in its brief that if there was a conflict at
trial, then there is also a conflict on appeal because there is only one appellate lawyer. The State
went on to suggest that because there was no waiver of the conflict as to the appeal, we should
report the appellate lawyer’s breach of rule of ethics 1.06. We should point out to the State that
the fact the record does not show a waiver as to the appeal does not mean there has not been one. 
Furthermore, the State’s silence about the substance of this issue, and its diversion to an attack on
the ethics of the appellate lawyer, do nothing to assist in resolving the issue.
The Right to Effective Assistance of Counsel
      Section 107.013 of the Family Code provides that in a termination suit, the court must appoint
an attorney for an indigent parent. Tex. Fam. Code Ann. § 107.013(a) (Vernon Supp. 2001). 
Furthermore, “[i]f both parents of the child are entitled to the appointment of an attorney . . . and
the court finds that the interests of the parents are not in conflict, the court may appoint a single
attorney . . . to represent the interests of both parents.” Id. (b). Villarrial was appointed under
this statute. The statute impliedly endorses the principle that a parent whose parental rights are
in jeopardy has a right to counsel — retained or, if the parent is indigent, appointed — to defend
those rights. Spring’s and Jimmy’s issue on appeal is about whether they had a right for that
representation to be effective, i.e., in this case, free of conflicts.
      Recently in In the Interest of J.B.C., A.B.C., and M.B.C., ___ S.W.3d ___, (Tex.
App.—Waco, May 16, 2001), we held that we will review unpreserved complaints about charge
errors that pertain to the two core issues in a termination case, i.e., (1) the statutory predicate
grounds for termination, and (2) whether termination is in the best interest of the child. We cited
In Interest of S.R.M., 601 S.W.2d 766, 769-770 (Tex. Civ. App.—Amarillo 1980, no writ)
(parental rights were terminated based on trial evidence of grounds not pled, without objection;
case reviewed, and reversed, for insufficient evidence in spite of trial by consent, because of the
constitutional dimension of termination cases). J.B.C. followed our holding in In the Interest of
A.P. and I.P., ___ S.W.3d ___, 2001 WL 206015 (Tex. App.—Waco, February 28, 2001), that
we will review unpreserved sufficiency-of-the-evidence complaints about the two core issues in
termination cases. Both cases were based on procedural due process. As we explained, the
“natural right existing between parents and their children is of constitutional dimensions.” See,
e.g., Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985) (referencing In re G.M., 596 S.W.2d 846,
846 (Tex. 1980)); In re Verbois, 10 S.W.3d 825, 830 (Tex. App.—Waco 2000, orig. proceeding);
Spangler v. Texas Dep’t of Protective & Regulatory Servs., 962 S.W.2d 253, 256 (Tex.
App.—Waco 1998, no pet.); see also In re T.V., 8 S.W.3d 448, 449-50 (Tex. App.—Waco 1999,
order) (an indigent person whose parental rights have been terminated is entitled to court-appointed
counsel on appeal), disp. on merits, 27 S.W.3d 622 (Tex. App.—Waco 2000, no pet.). 
“[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected
by the Fourteenth Amendment.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394,
71 L.Ed.2d 599 (1980); Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d
49 (2000) (grandparent’s rights case; “. . . the interest of parents in the care, custody, and control
of their children — is perhaps the oldest of the fundamental liberty interests recognized by this
Court” (citing Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). 
A parent’s right to the parent-child relationship is “essential,” “a basic civil right of man,” and
“far more precious than property rights.” Holick, 685 S.W.2d at 20 (quoting Stanley v. Illinois,
405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1976)).
      Because the parent-child relationship enjoys constitutional protection, the standard of proof
in a termination proceeding is elevated from “preponderance of the evidence” to “clear and
convincing evidence.” Santosky, 455 U.S. at 747, 102 S.Ct. at 1391. “[S]tate intervention to
terminate the relationship between [a parent] and [the] child must be accomplished by procedures
meeting the requisites of the Due Process Clause.” Id., 455 U.S. at 753, 102 S.Ct. at 1394
(quoting Lassiter v. Department of Social Services, 452 U.S. 18, 37, 101 S.Ct. 2153, 2156, 68
L.Ed.2d 640 (1981) (first dissenting opinion), and at 24-32, 101 S.Ct. at 2158-2162 (opinion of
the Court), and at 59-60, 101 S.Ct. at 2176 (STEVENS, J., dissenting)); see also M. L. B. v. S.
L. J., 519 U.S. 102, 120, 117 S.Ct. 555, 566, 136 L.Ed.2d 473 (1996) (state statute denying
appeal from a termination proceeding because appellant could not afford the cost of the record
violated procedural due process and equal protection). Therefore, “termination proceedings
should be strictly scrutinized.” Holick, 685 S.W.2d at 20. Accordingly, we held in A.P. and
J.F.C. that it was a violation of procedural due process in termination cases to not review
unpreserved complaints about sufficiency of the evidence and charge errors concerning the two
core issues.



      Furthermore, in A.P. we stated that because both termination cases and criminal cases have
elevated burdens of proof over that in ordinary civil trials, i.e., “clear and convincing” evidence
in termination cases and “beyond a reasonable doubt” in criminal cases, we thought it a “logical
extension” in termination cases to emulate criminal jurisprudence, which, pertinent to A.P., does
not require preservation of sufficiency-of-the-evidence issues. In addition to that rationale, we also
recognize that when appropriate, harmonization of civil and criminal jurisprudence is one of our
goals. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Therefore, when appropriate,
we look to criminal law to determine similar or corresponding issues in civil law. E.g., In the
Matter of C.M.G., 905 S.W.2d 56, 58 (Tex. App.—Austin 1995, no writ) (Section 54.03(e) of
the Family Code, which is identical in substance to article 38.14 of the Code of Criminal
Procedure, is interpreted pursuant to the decisions of the criminal courts.).
      In criminal cases there is a constitutional right to counsel. U.S. Const. amend. VI and XIV. 
Furthermore, “right to counsel is the right to the effective assistance of counsel.” United States
v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed. 2d 657 (1984) (quoting McMann
v. Richardson, 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 1449 n.14, 25 L.Ed. 2d 763 (1970));
Robinson v. State, 16 S.W.3d 808, 812 (Tex. Crim. App. 2000). By comparison, in termination
cases there is a statutory right to counsel.


 Because of the procedural due process concerns we
expressed in A.P. and J.F.C., and now in this case, and our recognition that it is appropriate in
termination cases to “extend” and harmonize with criminal jurisprudence, we now hold that the
statutory right to counsel likewise means the right to effective assistance of counsel. Our sister
court in Houston agrees. In the Interest of J.M.S., 2001 WL 220248 (Tex. App.—Houston [1st
Dist.], March 1, 2001).


 Just as a Sixth Amendment constitutional right to counsel in a criminal
case includes a right that the representation be effective, a statutory right to counsel in a
termination case includes a due-process right that the representation be effective.
The Legal Standard
      Having concluded that Spring and Jimmy had a right to effective assistance of counsel, we
must now determine if they received effective assistance. Again, in the interest of harmonization,
we look to criminal jurisprudence for guidance.
      In Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme
Court discussed Fourteenth Amendment (and thereby Sixth Amendment) ineffective-assistance-of-counsel claims in the context of a defense lawyer who has a conflict of interest arising from
representation of multiple clients.


 Texas follows the Cuyler analysis. See, e.g., Monreal v.
State, 947 S.W.2d 559, 564-65 (Tex. Crim. App. 1997). In Cuyler, two defense lawyers
represented three defendants in three trials; the defendants were tried one at a time. The defendant
in the first trial, Sullivan, claimed on appeal that the lawyers compromised his defense by, e.g.,
not calling defense witnesses so that prosecutors would not learn their testimony for use in the two
subsequent trials. At a hearing, one of the lawyers admitted that his decision not to call defense
witnesses was affected by his concern that revealing those witnesses would benefit the prosecution
in the other two trials. The Court acknowledged that Sullivan did not object to multiple
representation until after trial. Nevertheless, the Court said the Fourteenth Amendment was
violated if Sullivan could “demonstrate that an actual conflict of interest [occurred which]
adversely affected his lawyer’s performance.” Cuyler, 446 U.S. at 348, 100 S.Ct. at 1718. There
is no “prejudice” analysis. Rather, the defendant must only “[show] that his counsel actively
represented conflicting interests . . . .” Id., 446 U.S. at 349-50, 100 S.Ct. at 1719.
      At the pre-trial hearing, Villarrial requested separate trials because of the potential for a
conflict between his representation of Spring and of Jimmy. When his request was denied, he
called Spring and Jimmy to testify they had been informed of the potential conflict but nevertheless
agreed to be jointly represented by Villarrial. The court made no further inquiries into the
matter.


 The State claims that by their testimony Spring and Jimmy “waived” the right to
complain about this issue on appeal.


 However, that is not the law under Texas criminal
jurisprudence. If their acquiescence in joint representation is taken as a failure to object — which
is debatable because of Villarrial’s request for separate trials — that does not preclude a reversal
for ineffective assistance of counsel if (1) counsel was burdened by an actual conflict of interest
at trial, and (2) the conflict had an adverse effect on specific instances of counsel’s behavior. 
Monreal, 947 S.W.2d at 564; e.g., James v. State, 763 S.W.2d 776, 778-79 (Tex. Crim. App.
1989) (following Cuyler). “[A]n actual and significant conflict of interest of the degree requiring
reversal exists when ‘one defendant stands to gain significantly by counsel adducing probative
evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom
counsel is also representing.’” James, 763 S.W.2d at 779 (citing Foster v. State, 693 S.W.2d 412
(Tex. Crim. App. 1985)); Pina v. State, 29 S.W.3d 315, 317 (Tex. App.—El Paso 2000, no
pet.).


 “Where there is evidence of counsel’s ‘struggle to serve two masters’ that cannot be
seriously doubted, a finding of ineffective assistance based on counsel’s conflict of interest
necessarily follows.” Howard v. State, 966 S.W.2d 821, 826 (Tex. App.—Austin 1998, pet.
ref’d) (citing Ex parte Acosta, 672 S.W.2d 470, 474 (Tex. Crim. App. 1984), and Ex parte
McCormick, 645 S.W.2d 801, 806 (Tex. Crim. App. 1983)). In that event, prejudice or harm
need not be shown, and reversal is required. Ex parte Acosta, 672 S.W.2d at 474; McCormick,
645 S.W.2d at 806.
Application
      The State’s case, while consisting of a number of witnesses who testified about a variety of
matters, revolved around two volatile allegations: Spring was accused of intentionally scalding
B.R.D. and Jimmy was accused of being interested in child pornography. The other evidence was
not nearly as volatile, e.g., Jimmy consumed drugs on a few occasions, Jimmy hit Spring on a few
occasions, Jimmy stole a gun, Jimmy sometimes yelled at the kids, Spring and Jimmy missed some
counseling sessions, B.L.D. cracked his skull in an accidental fall while under Spring’s care, and
Dr. Shinder, although having never made any home visits, called for termination of parental rights
based on his office testing of Spring and Jimmy. Furthermore, excluding the scalding and
pornography allegations, there was no evidence at trial that:
      •    The children had been physically abused.
      •    The children had been sexually abused.
      •    The children had been exposed to pornography or other sexual activity.
      •    The children had been exposed to drugs or drug deals.



      •    The children had been kept in squalid or unsanitary living conditions.
      •    The children had serious medical needs that were left unattended.
      •    Spring and Jimmy were unwilling or unable to support the children.
      •    Spring and Jimmy were being controlled by drugs or alcohol.
Therefore, these two allegations — the scalding and the pornography — were critical to the
State’s case. 
      Before trial, Villarrial realized the potential problem. It was entirely possible that the
question of whether to terminate Spring’s parental rights might depend primarily on whether she
intentionally scalded B.R.D., a matter in which Jimmy was not involved, and the question of
whether to terminate Jimmy’s parental rights might depend primarily on whether he was interested
in child pornography, a matter in which Spring was not involved. A lawyer representing only one
of them could vigorously defend that lawyer’s client against specific allegations, without trying
to protect or defend the other party against what he or she was accused of, thereby avoiding “guilt
by association.” Also, each lawyer could “point the finger” at the other party to distance his
client from the other. By using these strategies, the jury might have terminated as to the other
party, but not as to the lawyer’s client. 
      At trial, the evidence developed exactly according to that pattern. As the trial unfolded, and
certainly before closing argument, Villarrial realized his predicament was such that he could not
forcibly advocate either 1) for Spring and against, or at least not for, Jimmy, or 2) for Jimmy and
against, or at least not for, Spring. This was the substance of his second complaint and request
to the trial court. Villarrial had an actual conflict due to his dual representation of Spring and
Jimmy. He tried to “straddle the fence” by stating in closing argument that Spring and Jimmy
were not legally a “team,” and reminding the jury that Spring testified she would leave Jimmy if
his rights were terminated but not hers. However, his hands were tied from strongly advocating
in favor of either Spring or Jimmy and against the other.
      The effect of the conflict is shown by an affidavit attached to Spring’s and Jimmy’s Motion
for New Trial. The affidavit was executed by one of the two jurors who did not vote to terminate
parental rights. It states in part: “In our deliberations, it became apparent that our jury was mainly
concerned with Jimmy Dossey’s ability to parent the children. Based on discussions with other
members of our jury, it is my opinion that if Spring Dossey had been tried without Jimmy Dossey,
our jury would not have terminated her parental rights. Although Spring Dossey testified that she
would leave Jimmy Dossey if our jury terminated his rights and not her rights, many members of
our jury were worried that if they did not terminate as to Spring Dossey, she would reunite with
Jimmy Dossey at a later date.”
      Villarrial’s performance was adversely affected by the conflict he labored under. Whichever
party he strongly advocated for, the other party would have been damaged thereby. That Villarrial
“struggl[ed] to serve two masters” cannot be seriously doubted, and that made his counsel
ineffective under constitutional standards. Howard, 966 S.W.2d at 826.
      Spring’s and Jimmy’s first issue is sustained.
ISSUE SEVEN: DISJUNCTIVE CHARGE
OF THE GROUNDS FOR TERMINATION
Background
      “The termination of the parent-child relationship might be called the capital punishment of
civil law.” Sampson & Tindall’s Texas Family Code Annotated Introductory Comment, p. 657
(West 2000). The grounds for termination are listed in section 161.001 of the Family Code. As
charged in this case, Spring’s and Jimmy’s rights would be terminated if the jury found:
      1. “. . . that the parent has done at least one of the following: 
 
A. Knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endanger the physical or emotional well-being of the children;
 
B. Engaged in conduct or knowingly placed the children with persons who engaged in
conduct which endangers the physical or emotional well-being of the children;” and
. . .
2. “. . . that termination of the parent-child relationship would be in the best interest of the
children. . . .”
See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2001). As to each child, the jury had to find
that Spring and Jimmy violated either “A” or”B” or both, and that termination was in the child’s
best interest. The jury’s findings had to be based on clear and convincing evidence. Id. §§
161.001, 161.206(a). Clear and convincing evidence means “that measure or degree of proof
which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.” Spangler v. Texas Dept. of Regulatory Services, 962 S.W.2d
253, 256 (Tex. App.—Waco 1998, no pet.); Leal v. Dept. of Protective and Regulatory Services,
25 S.W.3d 315, 319 (Tex. App.—Austin 2000, no pet.). Based on their findings, the jury was
asked to answer a series of questions of the broad-form: “Should the parent-child relationship
between [parent’s name] and [child’s name] be terminated?”
      Spring and Jimmy complain that because of the disjunctive wording regarding “A” and “B,”
coupled with the broad-form questions which simply asked if the parent-child relationships should
be terminated, it is impossible to know if at least ten jurors agreed on a single ground for
termination. Tex. R. Civ. P. 292 (“A verdict may be rendered in any cause by the concurrence,
as to each and all answers made, of the same ten members of an original jury of twelve . . . .”) 
At trial, no objection was made to the charge, and normally we would not review the issue. Tex.
R. App. P. 33.1(a). However, as previously explained, we held in In the Interest of J.F.C. that
in a termination-of-parental-rights case we will review unpreserved complaints about the two core
issues in a charge, i.e., (1) the statutory grounds for termination, and (2) whether termination is
in the child’s best interest.
Due Process and the Right to Jury Consensus
      The case most often cited in the area of broad-form questions in termination cases is Texas
Dept. of Human Services v. E.B., 802 S.W.2d 647 (Tex. 1990). The language in the charge in
E.B. is virtually identical to the language in Spring’s and Jimmy’s charge. The mother whose
rights were terminated complained on appeal that the broad-form questions were inadequate to
force compliance with Rule 292, and therefore broad-form questions were not “feasible,” Rule
277 of the Rules of Civil Procedure requires broad-form questions “whenever feasible,” Tex. R.
Civ. P. 277. Based on E.B., the broad-form is also recommended by the Pattern Jury Charges. 
Texas Pattern Jury Charges: Family PJC 218.1B, 218.3B, and 218.3C (1998). The Austin
court held that Rule 292 had been violated by the broad-form submission.


 Texas Dept. of Human
Services v. E.B., 766 S.W.2d 387 (Tex. App.—Austin 1989), rev’d, Texas Dept. of Human
Services v. E.B., 802 S.W.2d 647 (Tex. 1990). It also held that Rule 277's admonition for broad-form questions could be fulfilled by a series of questions which themselves were in broad-form,
i.e.: (1) Did the parent violate statutory ground A?; (2) Did the parent violate statutory ground
B?; (3) Is termination in the best interest of the child? Id. Finally, the court pointed out that a
broad-form question like “Should the parental rights be terminated?” allows the jury to invade the
court’s province by asking it to “determine the ultimate legal issue of whether the parent-child
relationship should be terminated — a function properly served only by a district court’s
judgment.” Id.
      However, the Texas Supreme Court disagreed. It interpreted “whenever feasible” in Rule
277 to mean “in any or every instance in which it is capable of being used.” E.B., 802 S.W.2d
at 649. “Unless extraordinary circumstances exist, a court must submit such broad-form
questions.” Id. Regarding Rule 292, the Court said: “The controlling question in this case was
whether the parent-child relationship between the mother and each of her two children should be
terminated, not what specific ground or grounds under § 15.02 [now § 161.001] the jury relied
on to answer affirmatively the questions posed.” Id.
      Rule 277 has since been revisited in Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 387-90
(Tex. 2000). In Crown Life valid and invalid theories of liability were included in a single broad-form question, making it impossible for the appellate court to review whether the jury found for
the plaintiff on any valid theory. The Court rejected the assertion that Rule 277 almost invariably
requires a broad-form question. “Rule 277 is not absolute; rather, it mandates broad-form
submission ‘whenever feasible’” Id. at 390. The Court reversed the judgment because of the error
in the charge. After Crown Life, the submission of disjunctive broad-form questions in
termination cases, at least without appropriate instructions to guard against a less-than-consensus
verdict, is no longer automatic.



      The procedural due process rationale we used to dispose of Spring’s and Jimmy’s effective-assistance-of-counsel issue applies here. Because of the heightened scrutiny in termination cases,
we are always mindful of whether the manner in which the jury is charged on “core” issues is
constitutional. The Supreme Court discussed jury unanimity and procedural due process in a
criminal case in Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The
plurality in Schad described no bright-line rule for determining the facts on which a jury must
reach a consensus. Rather, it said “that instead of such a test our sense of appropriate specificity
is a distillate of the concept of due process with its demands for fundamental fairness, . . . and for
the rationality that is an essential component of that fairness.” Id., 501 U.S. at 637, 111 S.Ct.
at 2500. The Court stated the problem as “describing the point at which differences between
means become so important that they may not reasonably be viewed as [alternative ways to commit
a single crime], but must be treated as differentiating what the Constitution requires to be treated
as separate offenses.” Id., 501 U.S. at 633, 111 S.Ct. at 2498. The four dissenters added:
“Allowing the jury to return a generic verdict following a prosecution on two separate theories
with specified elements has the same effect as a jury verdict of ‘guilty of crime’ based on
alternative theories of embezzlement or reckless driving.” Id., 501 U.S. at 656, 111 S.Ct. at 2510
(White, B., dissenting). 
      We hold that in termination cases, procedural due process requires a strict application of Rule
292's requirement of accord by ten or more jurors. As applied to Spring’s and Jimmy’s case, the
disjunctive form of the charge, without more, may violate due process because it allows for the
possibility of termination based on a statutory ground not found by at least ten jurors to have been
violated.


 The question is, for what facts in a termination case does due process require
agreement among the jurors?
The Legal Standard
      As stated above, when appropriate we attempt to harmonize civil and criminal jurisprudence,
looking to the criminal law to determine similar or corresponding issues in civil law. Johnson,
23 S.W.3d at 11; e.g., In the Matter of C.M.G., 905 S.W.2d at 58. Therefore we look to criminal
jurisprudence about when jury unanimity is required regarding fact issues.
      In Francis v. State, 36 S.W.3d 121 (Tex. Crim. App. 2000), Francis was indicted on a single
count of indecency with a child. The statute reads:
A person commits an offense if, with a child younger than 17 years and not his spouse,
whether the child is of the same or opposite sex, he: (1) engages in sexual contact with the
child . . .

Tex. Pen. Code Ann. § 21.11 (Vernon Supp. 2001).
“Sexual contact” means any touching of the anus, breast, or any part of the genitals of another
person with intent to arouse or gratify the sexual desire of any person.

Tex. Pen. Code Ann. § 21.01(2) (Vernon 1994). At trial, the State presented evidence of four
distinct incidents of alleged indecency, each occurring on different dates: two committed by
touching the child’s breast and two by touching her genitals. At the close of the evidence, Francis
requested that the State be made to elect to proceed on only one of the four incidents. The State
argued that the jury should be asked whether Francis “engag[ed] in sexual contact by touching the
breast or genitals of [victim].” The court granted the State’s request. Francis, 36 S.W.2d at 122. 
On appeal, Francis complained that the jury could have split on which of the two alleged acts of
indecency he may have committed, resulting in a verdict which was not unanimous. 
      Central to its disposition of the case was the Court of Criminal Appeal’s distinction between
submitting to the jury in the disjunctive (1) alternate theories of how a single offense was
committed, and (2) two separate offenses. Id. at 124. For the charge to have been correct, the
court reasoned, there must have been evidence of a single incident in which Francis may have
touched both the breast and the genitals of the victim. Id. Because that was not so, the breast-touching and the genital-touching were two separate offenses, occurring on separate dates. 
Consequently, it is possible that Francis was convicted by less than twelve jurors who believed
he touched the victim’s breast but not her genitals on a single occasion, or by less than twelve
jurors who believed he touched the victim’s genitals but not her breast on that occasion. The
judgment was reversed.
      The court distinguished Kitchens v. State, 823 S.W.2d 256 (Tex. Crim. App. 1991). In that
case — a death-penalty case — Kitchens was charged in a one-count indictment with capital
murder. In two separate application paragraphs, it was alleged he committed the murder in the
course of aggravated sexual assault and also in the course of robbery. Kitchens complained
because the jury was not required to agree unanimously whether he committed the murder in the
course of the assault or in the course of the robbery. The Court held: “It is appropriate where the
alternate theories of committing the same offense are submitted to the jury in the disjunctive for
the jury to return a general verdict if the evidence is sufficient to support a finding under any of
the theories submitted.” Id. at 258. ”[T]here is no general requirement that the jury reach
agreement on the preliminary factual issues which underlie the verdict.” Id. (citing Schad v.
Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)).
Application
      The question for us is: Is this a Francis case or a Kitchens case? Asked another way, are the
two grounds on which the State seeks to terminate Spring’s and Jimmy’s rights more like separate
offenses or more like different ways of committing a single offense? Section 161.001 lists
nineteen grounds for termination. Several of these grounds, including the allegations against
Spring and Jimmy, can be proved by evidence of one or more separate incidents of conduct. For
example, a parent may have “knowingly placed or knowingly allowed the child to remain in
conditions or surroundings which endanger the physical or emotional well-being of the child” on
six different occasions spread over a year. Tex. Fam. Code Ann. § 161.001(D) (Vernon Supp.
2001). Nevertheless, each ground is conceptually different, and evidence sufficient to prove one
is not necessarily sufficient to prove another. 
      The grounds alleged against Spring and Jimmy are in subsections “D” and “E” of section
161.001. Subsection “D” requires that:
1. The parent “[k]nowingly placed . . . the child . . . in conditions or surroundings which
endanger[ed] the physical or emotional well-being of the child,” or
 
2. “the parent . . . knowingly allowed the child to remain in conditions or surroundings which
endanger[ed] the physical or emotional well-being of the child.”

Subsection “E” requires that:
1. The parent “engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child,” or
 
2. “the parent . . . knowingly placed the child with persons who engaged in conduct which
endanger[ed] the physical or emotional well-being of the child.”

The statutory purpose for “D” and “E” focuses on different types of acts or omissions on which
termination can be based. “D” relates to “conditions or surroundings,” while “E” relates to
“conduct.” Otherwise, the subsections would be redundant and would not have been set forth
separately. Evidence sufficient to prove one is not necessarily sufficient to prove another. We
conclude that these two grounds are more like separate offenses in the criminal law than different
means. To comport with due process, they cannot be submitted in the disjunctive, at least not
without sufficient instructions to require the jury to agree by ten or more jurors which ground, if
any, was committed by each parent with respect to each child. Contra Matter of Marriage of Hill,
893 S.W.2d 753, 755-56 (Tex. App.—Amarillo 1995, writ denied).
      Because it is possible under the evidence in this case that less than ten jurors found that any
of the statutory grounds for termination occurred, harm is presumed. This conclusion is supported
by the decision in Crown Life, 22 S.W.3d at 387-90. As previously discussed, in Crown Life, the
trial court submitted a broad-form liability question to the jury which mixed different theories of
liability, some of which were invalid because the plaintiff lacked standing. The Court found error
and stated: “When a trial court submits a single broad-form liability question incorporating
multiple theories of liability, the error is harmful and a new trial is required when the appellate
court cannot determine whether the jury based its verdict on an improperly submitted invalid
theory.” Id. at 388. “[W]hen the trial court is unsure whether it should submit a particular theory
of liability, separating liability theories best serves the policy of judicial economy underlying Rule
277 by avoiding the need for a new trial when the basis for liability cannot be determined [on
appeal].” Id. at 390. See Tex. R. App. P. 44.1(a) (“No judgment may be reversed on appeal .
. . unless the error complained of . . . probably prevented the appellant from properly presenting
the case to the court of appeals.”). The statutory grounds for termination are comparable to legal
theories in a civil trial for damages. The appellate court must be able to review which grounds
were found by ten or more jurors. When that cannot be done, the error is “reversible”. 
      Spring’s and Jimmy’s seventh issue is sustained.
OTHER ISSUES
      Because of our resolution of issues one and seven, we do not reach Spring’s and Jimmy’s
other issues.
CONCLUSION
      Spring and Jimmy did not receive effective representation of counsel at trial because their
attorney had an actual conflict of interest which adversely affected his performance. In addition,
because of the wording of the charge, they have been deprived of a jury verdict that assures that
at least ten jurors agreed on the grounds for termination. Therefore, the judgment is reversed, and
the cause is remanded for a new trial. On retrial, jurors should be instructed that to answer “yes”
to a broad-form termination question concerning a particular parent and a particular child, ten or
more jurors must agree that that parent committed at least one of the statutory grounds for
termination regarding that child, and the same ten must agree that termination of that parent’s
rights is in that child’s best interest. Alternatively, individual questions as to each ground for
terminating and best interest as to each child may be submitted if broad-form submission is not
feasible.
TIMETABLE ON REMAND
      As it was in J.F.C., the State is now faced with a dilemma. The termination suit is now
beyond the one year, plus the 180-day extension, disposition requirement. Tex. Fam. Code Ann.
§ 263.401 (Vernon Supp. 2001). Ordinarily, by application of the Family Code sanctions, the
children must be immediately returned to their parents. See In re Bishop, 8 S.W.3d 412 (Tex.
App.—Waco 1999, orig. proceeding). However, the Family Code does not provide any procedure
after a reversal and remand on appeal. Therefore, as we did in J.F.C., we will instruct the parties
how to proceed and set a timetable, including a deadline for a new trial on remand. 
      Thus, we direct that within thirty days of the date of this Opinion, the trial court shall set a
date for a trial on the merits of the petition. Trial must begin no less than sixty nor more than 120
days from the date of this Opinion. In addition, if filed at least thirty days before the date the
court has set for trial, either party may file a motion with the trial court for a ninety-day extension
of the 120 days, which extension the trial court may grant for good cause. In that event, the trial
court shall set a new date for trial which must begin no more than 210 days from the date of this
opinion. 
      Furthermore, unless the trial court has rendered a final order on or before 125 days from the
date of this Opinion, or on or before 215 days from the date of this Opinion if the court grants an
extension, the trial court shall dismiss the suit. A final order is one that: (1) requires that a child
be returned to the child’s parent; (2) names a relative of the child or another person as the child’s
managing conservator; (3) without terminating the parent-child relationship, appoints the Texas
Department of Protective and Regulatory Services as the managing conservator of the child; or
(4) terminates the parent-child relationship and appoints a relative of the child, another suitable
person, or the Texas Department of Protective and Regulatory Services as managing conservator
of the child. See Tex. Fam. Code Ann. § 263.401 (Vernon Supp. 2001).
 
                                                                   BILL VANCE
                                                                   Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
      (Justice Gray dissenting)
Reversed and remanded
Opinion delivered and filed May 23, 2001
Publish