42 S.W.3d 248 (2001)
In the Interest of A.P. and I.P., Minor Children.
No. 10-00-00105-CV.
Court of Appeals of Texas, Waco.
February 28, 2001.
*252 Robert C. Dunn, Corsicana, for appellant.
Cathren Page Koehlert, Texas Dept. of Protective and Regulatory Services Austin, William L. Smith, Corsicana, for A.P. and I.P., Minor Children.
Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

OPINION
VANCE, Justice.
Daniel Peddicord and Natalie Conner had two children who were removed from their home by workers from the Texas Department of Protective and Regulatory Services-Child Protective Services *253 ("CPS") after Daniel and Natalie were arrested on felonies. Daniel was later imprisoned. CPS workers believed the conditions at home endangered the children. After attempts failed over the next year to remedy these conditions, CPS filed a petition to terminate Daniel's and Natalie's parental rights. Natalie relinquished her rights by affidavit. Daniel proceeded to jury trial, after which his rights were terminated.
Daniel complains on appeal that: (1) there was insufficient evidence to support the jury's answers to the three questions which resulted in the termination of his rights, and (2) testimony of statements made by the children was improperly admitted. We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Daniel and Natalie lived in a trailer with their son, I.P., age four, and their daughter, A.P., age five and one-half. Natalie's other daughter, S.C., almost seven, also lived with them. The location of S.C.'s father is unknown.
In February of 1997, CPS was called to the home by the Navarro County Sheriff's Department because Daniel and Natalie were being arrested on stolen-property and drug charges. When the CPS worker arrived, she found the inside of the trailer to be virtually uninhabitable and dangerous, with no working toilet or bathtub, one bed for five people, trash and garbage strewn about, exposed electrical wires, holes in the ceiling and floor, and heat from only a heater connected to a small butane tank. I.P. and A.P. were in the trailer. They had not eaten or bathed for a considerable period of time and had lice. I.P. told the CPS worker he smoked marijuana his daddy gave him.
S.C. was retrieved from school by CPS. Although the oldest child, she appeared to be the youngest, being very small for her age, possibly as a result of Fetal Alcohol Syndrome.
All three children were taken into custody by CPS, and were eventually placed in foster care. On March 3, 1997, CPS filed a petition and obtained an emergency order appointing CPS as temporary managing conservator of the three children. A hearing on temporary orders was held on March 7. At the hearing, it was revealed that CPS had files dating back to 1993 regarding incidents involving medical and physical neglect of all three children, and conditions similar to the ones just discovered. The court appointed CPS the temporary managing conservator of the children, and appointed Natalie and Daniel temporary possessory conservators.
Over the next few months, CPS developed Child's Service Plans and worked with Natalie to make changes necessary for the eventual return of the children. Several review and status hearings were held by the court. However, Natalie refused to comply with the service plans. Daniel, who had been in jail, was eventually convicted on January 22, 1998, of four home burglaries and sentenced to ten years in prison. Meanwhile, the children lingered in foster care. Finally, in January of 1998, the Texas Department of Protective and Regulatory Services filed an amended petition to terminate Daniel's and Natalie's parental rights.
Natalie eventually signed affidavits on April 2, 1999, to relinquish her parental rights to all three children. A Judgment of Termination was signed on July 26. Daniel continued to assert his parental rights to I.P. and A.P., and a jury trial was held January 10-12, 2000. The jury returned its verdict, finding by clear and convincing evidence that: (1) Daniel knowingly placed or allowed the children to *254 remain in conditions or surroundings which endangered their physical or emotional well-being; (2) Daniel engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) the termination of Daniel's parental rights would be in the best interest of the children.
At the conclusion of trial, Daniel's lawyer approached the bench and the following exchange occurred:
Ms. Glicksman: Your honor, I had requested that I might
The Court: Oh, yeah. Excuse Me.
Court Reporter: Do youall want this on the record?
The Court: No. No, it doesn't have to.
Presumably the lawyer requested to withdraw, because when the Order of Termination was signed on January 24, 2000, Daniel filed a pro-se "Motion to Appeal," requesting an appeal and based on indigency, appointment of a lawyer, which was granted on February 3, ten days after the final order.

ISSUE: SUFFICIENCY OF THE EVIDENCE
Termination of parental rights is governed by Tex. Fam.Code Ann. §§ 161.001-.211 (Vernon Supp.2001). As alleged in this case, Daniel's rights could be terminated if the jury determined by "clear and convincing evidence":
(1) that the parent has:
* * *
(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]
(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
* * *
and
(2) that termination is in the best interest of the child.
Tex. Fam.Code Ann. § 161.001 (Vernon 1996 and Supp.2001). If a jury found that Daniel violated either "D" or "E," and that termination was in the children's best interest, the court could terminate his rights. The jury's findings must be by clear and convincing evidence. Id., §§ 161.001, 161.206(a). Clear and convincing evidence means "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Spangler v. Texas Dept. of Regulatory Services, 962 S.W.2d 253, 256 (Tex. App.-Waco 1998, no pet.); Leal v. Dept. of Protective and Regulatory Services, 25 S.W.3d 315, 319 (Tex.App.-Austin 2000, no pet.).

Preservation and Review of the Complaint
At the outset we note that Daniel failed to preserve his sufficiency complaint. Normally, we do not review complaints in civil jury trials unless they have been preserved in the trial court.[1] Tex.R.App. P. 33.1. However, there is precedent for reviewing an unpreserved sufficiency complaint *255 in an involuntary termination case. In Interest of S.R.M., 601 S.W.2d 766, 769-70 (Tex.Civ.App.-Amarillo 1980, no writ) (parental rights were terminated based on trial evidence of grounds not pled, without objection; case reviewed, and reversed, for insufficient evidence in spite of trial by consent, because of the constitutional dimension of termination cases).
We take heed that the "natural right existing between parents and their children is of constitutional dimensions." Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985) (referencing In re G.M., 596 S.W.2d 846, 846 (Tex.1980)). "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (grandparent's rights case; "... the interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court .") (citing Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). A parent's right to the parent-child relationship is "essential," "a basic civil right of man," and "far more precious than property rights." Holick, 685 S.W.2d at 20, (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).
Because of the right's elevated status, the standard of proof required in a termination proceeding is elevated from "preponderance of the evidence" to "clear and convincing evidence ." Santosky, 455 U.S. at 747, 102 S.Ct. at 1391. "[S]tate intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." Id., 455 U.S. at 753, 102 S.Ct. at 1394 (quoting Lassiter v. Department of Social Services, 452 U.S. 18, 37, 101 S.Ct. 2153, 2156, 68 L.Ed.2d 640 (1981) (first dissenting opinion), and at 24-32, 101 S.Ct. at 2158-2162 (opinion of the Court), and at 59-60, 101 S.Ct. at 2176 (STEVENS, J., dissenting)); see also M.L.B. v. S.L.J., 519 U.S. 102, 120, 117 S.Ct. 555, 566, 136 L.Ed.2d 473 (1996) (state statute denying appeal from a termination proceeding because appellant could not afford the cost of the record violated procedural due process and equal protection). Therefore, "termination proceedings should be strictly scrutinized." Holick, 685 S.W.2d at 20.
We are not persuaded that application of Rule 33.1 in an involuntary-termination-of-parental-rights case to preclude review of the sufficiency of the evidence affords the parent due process. To terminate parental rights when there is insufficient evidence only because the complaint was not preserved in the trial court does not adhere to Fourteenth Amendment procedural due process. See Santosky, 102 S.Ct. at 1394. There is no "strict scrutiny" (quoting Holick) in such an approach.
The standard of proof in a termination case"clear and convincing evidence"is similar to the standard of proof in a criminal case, i.e., "beyond a reasonable doubt," in that a greater degree of evidence is required. Both are distinguished from the standard of proof in civil cases generally, i.e., "preponderance of the evidence." In criminal cases, sufficiency issues need not be preserved to be reviewed on appeal. Clewis v. State, 922 S.W.2d 126, 130-31 (Tex.Crim.App.1996) (Tex. Const. art. V, §§ 5 & 6 empowers the appellate courts to review evidence for sufficiency); Tex.R.App. P. 21.2 (a motion for a new trial is not required to preserve a complaint on appeal except when necessary *256 to adduce facts not in the record); Chesnut v. State, 959 S.W.2d 308, 311 (Tex. App.-El Paso 1997, no pet.) (a claim of factual insufficiency does not need to be preserved); Davila v. State, 930 S.W.2d 641, 649 n. 7 (Tex.App.-El Paso 1996, writ refused) (a claim of legal insufficiency does not need to be preserved). Comporting with that, even without the constitutional imperative of due process, review of the sufficiency of the evidence in termination cases regardless of preservation of the issue is a logical extension of the rule in criminal cases because there is an elevated burden of proof.
We believe the proper approach is to review the merits of the sufficiency complaints even if they have not been preserved procedurally. Our holding is limited to the core issues to be decided by a jury in an involuntary termination case, i.e., the section 161.001(1) violations of a predicate act and whether termination is in the best interest of the child. We hold that when either of these two core issues is challenged on appeal for sufficiency of the evidence, and no motion or objection was made at the trial court which would have preserved the complaint for appellate review under ordinary civil-review standards, we will nevertheless review the complaint.

Was the Evidence Sufficient
To determine whether the evidence is legally sufficient to support a jury finding, we consider only the evidence supporting the verdict "in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor." We will find the evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes the opposite of the finding. Merrell Dow Pharms, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L.Rev. 361, 362-63 (1960)). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, `rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.1995) (quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.1994)). The "no evidence" standard is the same for findings made under the "clear and convincing standard" as for a preponderance standard. See Justice Bill Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 48 Baylor L.Rev. 3 (1996).
To determine whether the evidence is factually sufficient to support a jury finding made under the "clear and convincing" standard, we consider all the evidence in the record both for and against it, and we will find the evidence factually insufficient "if the trier of fact could not reasonably find the existence of the fact to be established by clear and convincing evidence." Spangler, 962 S.W.2d at 257. This could occur if: "(1) the evidence is factually insufficient to support a finding by clear and convincing evidence; or (2) a finding is so contrary to the weight of contradicting evidence that no trier of fact could reasonably find the evidence to be clear and convincing." Id. This intermediate standard of review is necessary to protect the constitutionally protected interests involved in a termination of parental rights. Id.
*257 The charge required the jury to answer the following three questions:
1. Do you find from clear and convincing evidence that the father, Daniel Dale Peddicord, knowingly placed or knowingly allowed the children, I.P. and A.P., to remain in conditions or surroundings which endangered the physical or emotional well-being of the children?
2. Do you find from clear and convincing evidence that the father, Daniel Dale Peddicord, engaged in conduct or knowingly placed the children, I.P. and A.P., with persons who engaged in conduct which endangered the physical or emotional well-being of the children?
If you have answered "Yes" to either Question No. 1 or 2, then answer Question No. 3; otherwise, do not answer Question No. 3.
3. Do you find from clear and convincing evidence that termination of the parent-child relationship between the father, Daniel Dale Peddicord, and the children, I.P. and A.P., would be in the best interest of the children?
The jury answered "Yes" to all three questions. Daniel complains that the evidence was insufficient to support these answers. We disagree.
Legal Sufficiency of the Evidence
To be legally sufficient, there must have been more than a scintilla of evidence that Daniel endangered the children by either placing them or allowing them to remain in circumstances which endangered them, or by engaging in conduct or placing the children with persons who engaged in conduct which endangered them, and that termination was in the children's best interest.
As more fully described in the section below on "factual sufficiency of the evidence", witnesses testified that the children lived in squalid surroundings at home. There were unsanitary living conditions and no indoor toilet facilities. The children's physical and medical needs were not properly attended to. They were dirty, wore soiled clothes, and had head lice. I.P. was given marijuana by Daniel, and Daniel may have sexually abused A.P.
We find this evidence legally sufficient to prove both of the grounds alleged for termination. It also is more than a mere scintilla that termination was in the children's best interest for their physical and psychological well-being.
Factual Sufficiency of the Evidence
To determine if the evidence was factually sufficient for each of the three jury findings, we review all the evidence to determine if the jury could reasonably have found the facts at issue to be established by clear and convincing evidence. Spangler, 962 S.W.2d at 259.
The jury heard evidence about the first investigation by CPS in 1993. CPS workers found Natalie and the children living in a cab-over camper. There was no toilet, a lack of sanitation, no refrigerator, and no food. The children were dirty and smelled, had on dirty diapers, and had untreated colds. Their eyes were running with pus. Workers had no contact with Daniel during this incident, although there was a conversation with him fourteen days later at a status hearing. The children were temporarily placed in foster care, and later returned to Natalie.
Testimony was also presented about a 1995 investigation. Workers found unsanitary conditions inside the residence, holes in the floor, and sharp protruding edges from metal objects in the children's bedrooms. The children again were dirty and had on soiled clothing. They also had lice. In 1995, Daniel was not living with Natalie and the children. The children were temporarily placed with friends or relatives.
*258 There was also testimony of a 1996 incident in which a law enforcement officer tried to visit the home of Daniel and Natalie. He was met by Daniel who was carrying a shotgun, cursed by Natalie, and threatened by other family members.
Finally, the jury heard evidence and was shown pictures about the 1997 incident which began the series of events leading to the termination of Daniel's parental rights. In January of 1997, Daniel committed four home burglaries of which he was later convicted and sentenced to ten years incarceration. He was arrested for these burglaries in February of 1997 at the trailer where he lived with Natalie and the children. During this arrest and search of the trailer, police officers and a CPS worker found evidence of unsafe and unhealthy living conditions.
Officers found raw sewage on the ground outside the trailer. One officer testified that in his twenty-six years of experience the inside of the residence was one of the top ten nastiest he had seen. There was mud everywhere, holes in the floor and ceiling, clothing piled around, and a bad smell which permeated the place. Some marijuana and narcotics paraphernalia were found in and around the bed.
A CPS worker testified there was trash inside the trailer which smelled, medicine on the floor in easy access of the children, trash in the bathtub, and no operable toilet. Clothes were piled to the ceiling in one room, there was no place to sit, and there was a pest control problem. The children were hungry, had head lice, and could not recall when they had last bathed or eaten. I.P. told a CPS worker he smoked marijuana which he got from his father, and he explained how to roll a marijuana cigarette.
After this evidence, the jury heard testimony about the current physical and psychological conditions of the children. Witnesses included foster parents, a foster-care worker, and a therapist.
A.P. lived in foster care. Overall, she had made some progress since being placed in the state's care. However, she had serious eye problems, and also speech problems requiring weekly therapy. She required occupational therapy because she was uncoordinated, and she was in a special reading class at school. A.P. liked to sleep with the lights on because she was afraid she would be taken away. She was angry and defiant, and would not obey adults. She said Daniel was mean, whipped her and hit Natalie, was mean to animals and killed them, and that she hated him and was mad at him for being in jail. Only eight years old, she acted out sexually with men, and masturbated often, even in public. She told her foster mother that Daniel taught her to masturbate, and that she wanted to stay with the foster mother so she would not have to stay locked up all the time. Her therapist stated Daniel probably sexually abused her.
I.P. was also in foster care. He attended weekly counseling for behavioral problems. Age seven, he still wore diapers, would not use the toilet, and frequently wet his pants. I.P. liked to use curse words, and talked a lot about taking drugs and alcohol given him by his dad. I.P. had a problem with his temper, and according to his therapist, had oppositional defiant disorder. He displayed signs of having no conscience. He also expressed suicidal ideas. I .P. was angry with Daniel, who he said was mean. He also said Daniel gave him drugs and alcohol. I.P. blamed himself for Daniel being in jail, and for Daniel's drug and alcohol problems.
CPS workers testified that adoption was the only acceptable long-term solution for *259 the children. The chances were good that suitable adoptive homes could be found.
Daniel also testified at trial. He had served three of his ten-year sentence, and was eligible for parole in 2000. He thought Natalie was a good mother, although he said the marijuana found in the trailer in February of 1997 was hers. He said the care-taking of the children was left to Natalie. He claimed the disarray in the trailer in 1997 was caused by police officers tearing up the place looking for contraband. He denied that the living conditions testified about in 1993 and 1997 were bad. He also denied that the children had behavioral problems. He testified he had sent letters and other items over the years to the children. He admitted he could not provide for his children now, but was taking a life-skills course and a computer course in prison.
Daniel called a relative, Timothy Peddicord, to testify. He said Daniel was a good and loving father, and he denied ever witnessing any abuse of the children by Daniel.
The evidence strongly supports the jury finding that Daniel caused the children to be endangered. Although "`endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family life, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." Texas Dept. of Human Services v. Boyds, 727 S.W.2d 531, 533 (Tex. 1987). The term simply means "to expose to loss or injury; to jeopardize." Id. For example, allowing children to live in unsanitary conditions, and neglecting their physical condition, can be endangerment. In re M.C., 917 S.W.2d 268, 269 (Tex.1996).
In addition, the evidence supports the finding that termination was in the children's best interest. The Texas Supreme Court has identified some of the factors which might justify this finding. The list is not exhaustive, nor must there be evidence of all the factors. The factors pertinent to this case are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the plans for the child ... by the agency seeking custody; (5) the stability of the home or proposed placement; (6) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (7) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). The evidence is strong that termination was in the best interest of I.P. and A.P.
We find that there was more than sufficient evidence to support the jury's findings by clear and convincing evidence. Daniel's sufficiency issue is overruled.

ISSUE: HEARSAY
Daniel's complaint is that five witnesses gave hearsay testimony about statements made to them by the children. He claims the hearsay was properly objected to during the trial. The alleged hearsay was:
Sarena Wilki, A.P.'s foster mother, testified A.P. said she did not get to see much of the world, did not have conversations with Daniel and Natalie about her relatives, and was afraid of Daniel, who beat Natalie and hit Natalie in the head.
Ramona Harris, I.P.'s foster mother, testified I.P. said he blamed himself for being in foster care, because if he had told his daddy to not take drugs and alcohol, his daddy would be at home.
Anntionette Johnson, a foster care worker, testified about "... statements [which] were not hearsay as to what the *260 child said, but were actions which were no more than short hand rendering of hearsay...."[2]
Barbara Buss, a therapist, testified A.P. said Daniel taught A.P. how to masturbate, was mean to animals and killed them, and was mean to Natalie. A.P. also said she hated Daniel because he is in jail, and because of his drug and alcohol use.
Karen Griffin, a CPS worker, testified I.P. told her during the 1997 incident at the trailer, that he smoked marijuana given him by Daniel.
Daniel asserts that this testimony was hearsay, governed by article 38.072 of the Code of Criminal Procedure. That article is entitled: "Hearsay Statement of Child Abuse Victim." Section 1 of the article states: "This article applies to a proceeding in the prosecution of an offense under any of the following provisions of the Penal Code, if committed against a child 12 years of age or younger." It allows for hearsay from a child to be admitted if (1) the hearsay is about the alleged offense, (2) the hearsay was made to the first person age eighteen or over to whom the child made his or her first statement about the offense, (3) certain notice and discovery requirements are followed, (4) the judge conducts a hearing to determine if the hearsay is reliable, and (5) the child testifies or is available to testify at trial. Daniel presents no authority that article 38.072 applies to a civil proceeding to terminate parental rights. Daniel's argument actually is one under the Rules of Evidence, specifically Rules 801 through 806.
On the second day of trial, Sarena Wilki testified. At one point, she was asked: "What has [A.P.] told you about the life she had when she lived with." Defense counsel objected: "That's hearsay." The objection was overruled, and Wilki testified about A.P.'s statements concerning not getting to see the world, not having conversations about relatives, and Daniel. Defense counsel then objected: "I'm going to object to this line of questioning as hearsay. Anything thatjust, I'm going to make one objection to anything that's repeated that the children [say] as being hearsay and also prejudicial value outweighs probative [value]." The court responded: "Proceed." Ramona Harris testified next, and the day concluded. The other three witnesses about whom Daniel complains were called the next day of trial. Defense counsel did not make any more objections about hearsay concerning the children after the two objections during Wilki's testimony.
Defense counsel attempted a running objection. Running objections are an exception to the general rule that a party must continue to object and get a ruling for each individual instance of inadmissible testimony. Ethington v. State, 819 S.W.2d 854, 858-59 (Tex.Crim.App. 1991); see Leaird's Inc. v. Wrangler, Inc., 31 S.W.3d 688, 690 (Tex.App.-Waco 2000, pet. denied). Such an objection should "not encompass too broad a reach of subject matter over too broad a time or different witnesses. Rule 52(a)[3] must be complied with." Ethington, 819 S.W.2d at 859. Arguably, the objection was not worded sufficiently to even qualify as a running objection. In addition, the objection was to "anything that's repeated that the children [say]," which is too broad because it extends to all testimony by all witnesses about any statements made by the children. Not all statements made by the children are necessarily hearsay. Finally, no ruling was obtained on the objection as *261 required by Rule 33.1(a), and so the complaint was not preserved.
Assuming arguendo the complaint had been properly preserved, in jury trials running objections generally apply only to similar testimony by the same witness. Commerce, Crowdus & Canton v. DKS Const., 776 S.W.2d 615 (Tex.App.-Dallas 1989, no writ); Leaird's, 31 S.W.3d at 690; City of Fort Worth v. Holland, 748 S.W.2d 112, 113 (Tex.App.-Fort Worth 1988, writ denied). The extent to which a running objection may cover testimony of subsequent witnesses depends on an analysis of several factors: (1) the nature and similarity of the subsequent testimony to the prior testimony, (2) the proximity of the objection to the subsequent testimony, (3) whether the subsequent testimony is from a different witness, (4) whether a running objection was requested and granted, and (5) any other circumstances which might suggest why the objections should not have to be reurged. Correa v. General Motors Corp., 948 S.W.2d 515, 518-19 (Tex.App.-Corpus Christi 1997, no writ).
Applying these factors, the running objection did not run to the other four witnesses. Wilki testified A.P. told her she did not get to see much of the world, did not have conversations about her family, and was afraid of Daniel who beat Natalie and hit her in the head. Only the last statement by Ms. Wilki is similar to any of the alleged hearsay testimony of the other four witnesses. In addition, the other alleged hearsay was from four different people, three of whom testified the next day. Furthermore, the objection was not requested as a running objection, and it was never granted. Considering all these facts, defense counsel could not reasonably expect the objection made to Wilki's testimony to apply to the other four witnesses. Therefore, the objection did not extend to the other four witnesses.[4] Tex.R. Evid. 103(a); Tex.R.App. P. 33.1.
Even if a proper running objection had been made as to Wilki, her alleged hearsay either was not hearsay or was admissible under an exception to hearsay. The statements concern the state of mind of A.P., and so are not hearsay because they are not offered to prove the truth of the matter asserted. Tex.R. Evid. 801(d). They also fall under exceptions in Rule 803 of the Rules of Evidence to the inadmissability of hearsay. Examples are Rule 803(3), "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)," and Rule 803(4), "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
Daniel's hearsay issue is overruled.

CONCLUSION
We affirm the Order of Termination.
NOTES
[1] Legal sufficiency is preserved by: (1) a motion for new trial, (2) a motion for an instructed verdict, (3) an objection to the submission of a question in the charge, (4) a motion for a judgment notwithstanding the verdict, or (5) a motion to disregard the jury's answer to a question in the verdict. Cecil v. Smith, 804 S.W.2d 509, 510-11 (Tex.1991). Factual sufficiency is preserved by a motion for a new trial. Tex.R. Civ. P. 324(b)(2).
[2] Appellant's brief, p. 20.
[3] Now 33.1(a).
[4] Relevant to Daniel's other issue on appeal, the sufficiency of the evidence, any inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay. Tex.R. Evid. 802.