In the Interest of FC, CC and TC, Minor Children















IN THE
TENTH COURT OF APPEALS
 

No. 10-01-088-CV

IN THE INTEREST OF
F.C., C.C., AND T.C., MINOR CHILDREN

 

From the 82nd District Court
Falls County, Texas
Trial Court # 33,276
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
O P I N I O N
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â Mary Cumminsâs parental rights were terminated by the trial court in October 2000. She
raises four issues on appeal. She argues that: 1) the trial court failed to notify the Indian tribe of
their right of intervention as required by the Indian Child Welfare Act; 2) the trial court failed to
correctly apply the Indian Child Welfare Act standard for termination of parental rights of an
Indian child; 3) the trial court erred in finding that Cummins engaged in conduct that endangered
the physical or emotional well-being of the children; and 4) the trial court erred in finding that
Cummins failed to comply with a court ordered âplan of service.â
Indian Child Welfare Act
Â Â Â Â Â Â In her first point, Cummins argues that the trial court erred in terminating her parental rights
without notifying the tribe of their right of intervention. In her second point, she asserts that the
court applied the improper standard of review for termination of an Indian child under the Indian
Child Welfare Act (âICWAâ).
Â Â Â Â Â Â The provisions of the ICWA must be followed in any proceedings involving termination of
the parental rights over Indian children. See Indian Child Welfare Act, 25 U.S.C.A. Â§ 1912
(1983); Doty-Jabbaar v. Dallas County Child Protective Services, 19 S.W.3d 870, 874 (Tex.
App.âDallas 2000, pet. denied). The ICWA provides in any involuntary proceeding in State
court, where the court knows or has reason to know that an Indian child is involved, the party
seeking termination shall notify the parent, Indian custodian, and the Indian childâs tribe. 25
U.S.C.A. at Â§ 1912. Under the ICWA, an Indian child is defined as âany unmarried person who
is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for
membership in an Indian tribe and is the biological child of a member of an Indian tribe.â Id. at
Â§ 1903 (4).
Â Â Â Â Â Â Cummins argues that the trial court terminated her parental rights without first notifying the
Indian tribe, and without applying the proper standard of review under the Act. However,
Cummins presents no evidence to support her contention that the children qualify as âIndian
childrenâ under the ICWA. The sole evidence of Cumminsâ alleged Indian heritage was a
statement in Dr. Shinderâs report stating she was a âCaucasian/Native American (Cherokee
descent) woman.â
Â Â Â Â Â Â In order to ensure jurisdiction, this Court requested an affidavit containing the facts
supporting Cumminsâs position that the children are âIndian childrenâ as defined by the ICWA. 
See Tex. Govât Code Ann. Â§ 22.220(c) (Vernon 1988); Tex. R. App. P. 10.2(a); Mellon Service
Co. v. Touche Ross & Co., 946 S.W.2d 862, 864 (Tex. App.âHouston [14th Dist.] 1997, no
pet.). In her affidavit, Cummins stated: âI am not an enrolled member of any tribe. To the best
of my knowledge, neither of my parents were members of a tribe. I have never taken the steps
necessary to enroll my children in any tribe.â Because her children are neither a) members of an
Indian tribe, or b) eligible for tribe membership and the biological child of a member of an Indian
tribe, the ICWA does not apply. See 25 U.S.C.A. Â§ 1903 (4). Accordingly, we find notice to an
Indian tribe as specified in the ICWA is not required, and the court was not required to apply the
standard of review for termination as set forth in the ICWA. Accordingly, points one and two are
overruled.
Clear and Convincing Evidence
Â Â Â Â Â Â In point three, Cummins argues that the trial court erred in finding that she engaged in
conduct that endangered the physical or emotional well-being of the children. On appeal, an
involuntary termination of parental rights must be strictly scrutinized because termination
proceedings involve the fundamental constitutional rights surrounding the parent-child relationship. 
See Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); In re D.L.N., 958 S.W.2d 934, 936 (Tex.
App.âWaco 1997, pet. denied). A termination of parental rights is an irrevocable act severing
the parent-child relationship for all purposes, except for the right of inheritance. Id.; Tex. Fam.
Code Ann. Â§ 161.206(b) (Vernon 1996). Because a termination involves rights of "constitutional
dimension," the grounds for termination must be proved by clear and convincing evidence at trial. 
See id. at Â§ 161.001 (Vernon Supp. 2001); Â§ 161.206(a); D.L.N., 958 S.W.2d at 936 (citing
Richardson v. Green, 677 S.W.2d 497, 500 (Tex. 1984)). Termination of parental rights is a two
prong test. The trial court must find by clear and convincing evidence that the parent 1) engaged
in one of the predicate acts listed in the Family Code, and 2) that termination was in the children's
best interest. See Â§Â§ 161.001(1) & 161.001(2); In re A.P., 42 S.W.3d 248, 257 (Tex.
App.âWaco 2001, no pet.). Thus, the court may order termination if the court finds by clear and
convincing evidence that the parent has engaged in conduct or knowingly placed the child with
persons who engaged in conduct which endangered the physical or emotional well-being of the
child and termination was in the childâs best interest. Id. at Â§Â§ 161.001(1)(E) & 161.001(2).
Â Â Â Â Â Â Cummins argues that an abuse of discretion standard should apply to the courtâs termination
of her parental rights. We disagree. The trial court's findings of fact after a bench trial are
reviewed for legal and factual sufficiency by the same standards applied in reviewing the evidence
supporting a jury's answer. See Cason v. Taylor, 51 S.W.3d 397, 403 (Tex. App.âWaco 2001,
no pet.); Hitzelberger v. Samedan Oil Corp., 948 S.W.2d 497, 503 (Tex. App.âWaco 1997, writ
denied). No findings of fact or conclusions of law were filed in this case, but a reporterâs record
was filed. When, as here, no findings of fact or conclusions of law are requested or filed, we
imply all necessary findings in support of the trial court's judgment. See Holt Atherton Indus.,
Inc. v. Heine, 835 S.W.2d 80, 83 (Tex. 1992); Casino Magic Corp. v. King, 43 S.W.3d 14, 19
(Tex. App.âDallas 2001, pet. denied). When a reporter's record is included in the record on
appeal, the implied findings may be challenged for legal and factual sufficiency. See Roberson
v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam); King, 43 S.W.3d at 19. We review
implied findings by the same standards we use in reviewing the sufficiency of the evidence to
support a jury's answers or a trial court's fact findings. Id. Cummins fails to state in her brief
whether she is challenging the legal or factual sufficiency of the evidence. Despite Cumminsâs
failure to articulate her specific sufficiency challenge, we will review the evidence for both legal
and factual sufficiency in the interest of justice.Legal Sufficiency
Â Â Â Â Â Â To determine whether the evidence is legally sufficient to support the courtâs finding, we
consider only the evidence supporting the verdict "in the light most favorable to the party in whose
favor the verdict has been rendered, and every reasonable inference deducible from the evidence
is to be indulged in that party's favor." We will find the evidence legally insufficient if: (1) there
is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but
rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more
than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes
the opposite of the finding. Merrell Dow Pharms, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997) (citing Robert W. Calvert, âNo Evidenceâ and âInsufficient Evidenceâ Points of Error, 38
Tex. L. Rev. 361, 362-63 (1960)). "More than a scintilla of evidence exists when the evidence
supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.'" Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499
(Tex. 1995) (quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994)). The
"no evidence" standard is the same for findings made under the "clear and convincing standard"
as for a preponderance standard. See Spangler v. Texas Dept. of Regulatory Services, 962 S.W.2d
253, 257 (Tex. App.âWaco 1998, no pet.).
Factual Sufficiency
Â Â Â Â Â Â To determine whether the evidence is factually sufficient to support a jury finding made under
the "clear and convincing" standard, we consider all the evidence in the record both for and
against it, and we will find the evidence factually insufficient "if the trier of fact could not
reasonably find the existence of the fact to be established by clear and convincing evidence." Id. 
This could occur if: "(1) the evidence is factually insufficient to support a finding by clear and
convincing evidence; or (2) a finding is so contrary to the weight of contradicting evidence that
no trier of fact could reasonably find the evidence to be clear and convincing." Id. This
intermediate standard of review is necessary to preserve the constitutionally protected interests
involved in a termination of parental rights. Id.
Evidence
Â Â Â Â Â Â Cumminsâs three children are F.C., T.C., and C.C. The evidence demonstrates the
following:
Â Â Â Â Â Â 1) Cummins struck F.C. at the grocery store on one occasion;

Â Â Â Â Â Â 2) Cummins left T.C. in the Wal-Mart parking lot and drove off without her;

Â Â Â Â Â Â 3) C.C. had bruises and marks on his body and neck;
Â 
4) C.C. had a cigarette burn on his chest while Cummins placed him under the care of
her aunt;
Â 
5) With all the children riding along as passengers, Cummins wrecked her car while she
was intoxicated and speeding;
Â 
6) Cummins admitted that her alcohol problems may have contributed to her past
mistakes with the childrenâs care;
Â 
7) F.C. and T.C. reported incidents of sexual abuse by their brother C.C.;
Â 
8) F.C. reported that Terry Washington, Cumminsâs boyfriend, touched her
inappropriately;
Â 
9) Child Protective Services (âCPSâ) reported that the Cummins home where the children
lived was filthy, smelled foul, and was infested with roaches and spiders; and
Â 
10) The CPS visits to the Cummins home indicated that the children appeared hungry,
dirty, and there was no running water.
Â Â Â Â Â Â Despite abandoning her service plan and stating that she wanted the children to live with her
aunt, Cummins decided to fight the termination of her parental rights. She said she still loves her
children and admitted making âmistakesâ in the past. She testified that she was unaware of any
sexual abuse of the children. She further testified that she no longer abuses alcohol and has
obtained steady employment.
Endangerment
Â Â Â Â Â Â The evidence strongly supports the courtâs finding by clear and convincing evidence that
Cummins caused the children to be endangered. Although âendanger means more than a threat
of metaphysical injury or the possible ill effects of a less-than-ideal family life, it is not necessary
that the conduct be directed at the child or that the child actually suffers injury.â In re M.C., 917
S.W.2d 268, 269 (Tex. 1996) (quoting Dep't of Human Services v. Boyd, 727 S.W.2d 531, 533
(Tex. 1987). The term simply means âto expose to loss or injury; to jeopardize.â Id. For
example, allowing children to live in unsanitary conditions, and neglecting their physical
condition, can be endangerment. See id. at 270. Here, CPS reports demonstrated that Cummins
allowed the children to live in unsanitary conditions and neglected their physical condition.
Â Â Â Â Â Â Furthermore, the courts have found that a "course of conduct" by a parent that jeopardizes
a child's physical or emotional well-being is evidence of endangerment as defined by Boyd. See
Boyd, 727 S.W.2d at 533; D.L.N., 958 S.W.2d at 938. In the D.L.N. case, we could not point
to one specific act that justified termination of parental rights. We did, however, find that the
pattern established by the parent's bad temper, neglect of the child's physical and emotional
well-being, inability to deal with the child's emotional needs, limited interaction with the child,
and treatment of the child's siblings was legally sufficient to support an involuntary termination
under section 161.001(1)(E). Id. at 938-39. Such a course of conduct applies in this case. 
Cumminsâs pattern of substance abuse and neglect, coupled with the evidence of sexual and
physical abuse of the children while under her care, shows a course of conduct that endangered
the physical and emotional needs of the children. 
Â Â Â Â Â Â Viewing the evidence in a light that supports the trial courtâs finding, we conclude that there
was more than a scintilla of evidence that Cummins engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the physical or emotional well-being of each child. We find the evidence legally sufficient to support the courtâs finding of
endangerment.
Â Â Â Â Â Â Viewing all the record evidence we cannot say that the courtâs finding of endangerment was
against the great weight and preponderance of the evidence. Accordingly, we find the evidence
factually sufficient to support the courtâs finding of endangerment. We now examine the best
interest evidence for legal and factual sufficiency.
Best Interest
Â Â Â Â Â Â The evidence in the present case must also support the courtâs finding by clear and convincing
evidence that termination was in the children's best interest. The Texas Supreme Court identified
some of the factors which might justify such a finding. See Holley v. Adams, 544 S.W.2d 367,
372 (Tex. 1976); see also In re J.O.C., 47 S.W.3d 108, 114-15 (Tex. App.âWaco 2001, no
pet.). The list is not exhaustive, nor must there be evidence of all of the factors. See J.O.C., 47
S.W.3d at 115. The factors pertinent to this case are: (1) the emotional and physical needs of the
child now and in the future; (2) the emotional and physical danger to the child now and in the
future; (3) the acts or omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; (4) parental abilities; and (5) any excuse for the acts or omissions
of the parent.
Â Â Â Â Â Â The evidence is strong that termination was in the best interest of these children. The record
shows that Cummins consistently failed to meet the physical and emotional needs of the children. 
CPS visits found the children hungry and dirty on more than one occasion, and the home was
reported filthy and without running water. Cummins, while intoxicated, placed the children in
physical danger and an automobile accident resulted. She also abandoned her youngest child in
a store parking lot. Further, Cummins exposed the children to physical and sexual abuse while
under her care. Accordingly, we find the record legally and factually sufficient to support
involuntary termination of Cumminsâ parental rights. Point three is overruled.
Â Â Â Â Â Â Cummins argues in point four that the trial court erred in finding that she failed to comply
with a court ordered âplan of service.â Having already found that the courtâs termination was
supported by sufficient evidence, we need not address this issue. Point four is overruled.
Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â REX D. DAVIS
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Before Chief Justice Davis,
Â Â Â Â Â Â Justice Vance, and
Â Â Â Â Â Â Justice Gray
Affirmed
Opinion delivered and filed January 23, 2002
Do not publish
[CV06]



 led to its enactment. Â Stracener, 777 S.W.2d at 382. Â A policy provision frustrates the statuteÂs
intended purpose by Âlimit[ing] the possibility that an injured insured can
recover actual damagesÂ or reducing protection Âbelow
the minimum [statutory] limits.Â Â Id. at 383; Kidd,
997 S.W.2d at 270, 276.

Â Â Â Â Â Â Â Â Â Â Â  ProgressiveÂs policies state that it
Âwill pay damages which a covered person is legally entitled to recover from
the owner or operator of an uninsured motor vehicle.ÂÂ  A vehicle is underinsured
where Âits limit of liabilityÂ is insufficient to Âpay the full amount the
covered person is legally entitled to recover as damagesÂ or Âhas been reduced
by payment of claims to an amount which is not enough to pay the full amount
the covered person is legally entitled to recover as damages.Â Â The policies
also contain a ÂTwo or More Auto
PoliciesÂ provision:

If this policy and any other auto insurance policy
issued to you by us apply to the same accident, the maximum limit of our
liability under all the policies shall not exceed the highest applicable limit
of liability under one policy.

Â 

Citing Fidelity & Casualty Co. v.
Gatlin, American Liberty Insurance Co. v. Ranzau, Stracener, and
Briggs, Kelley argues that this clause is an Âother insuranceÂ provision
that Âcontravenes the purpose and intent of the UM Statute and is contrary to
public policy.Â[5]

Â Â Â Â Â Â Â Â Â Â Â  In
Gatlin, Margaret Gatlin was killed when the vehicle in which she was
riding, owned by Mrs. James W. Talley, was struck by an uninsured motorist.Â  See
470 S.W.2d 924, 925 (Tex. Civ. App.ÂDallas
1971, no writ).Â  Talley carried insurance with Republic Insurance Company, and MargaretÂs husband
carried insurance with Fidelity & Casualty Company.Â  Id.Â  Fidelity
argued that Gatlin could not recover under its policy Âbecause of the Âpro rata
clause of the Republic policyÂ and the Âexcess insuranceÂ clauseÂ in FidelityÂs
policy.Â  Id. at 926.Â  The Dallas Court disagreed and held:

(1) that our uninsured
motorist statute sets a minimum amount of coverage but it does not place a
limit upon the total amount of recovery so long as that amount does not exceed
the amount of actual loss; (2) that where the loss exceeds
the limits of one policy, the insured may proceed under other available
policies; (3) and that where uninsured motorist coverage
has been provided, we cannot permit an insurer to avoid its statutorily imposed
liability by its insertion into the policy of a liability limiting clause which
restricts the insured from receiving the benefit of that coverage.

Â 

Id. at 928.

Â Â Â Â Â Â Â Â Â Â Â  In Ranzau, Paula Ranzau
suffered injuries when the vehicle in which she was riding, owned by Victor Raphael,
was struck by an uninsured motorist.Â  See 481 S.W.2d 793, 794-95 (Tex. 1972).Â  Raphael carried insurance with USAA,
and PaulaÂs father carried insurance
with American Liberty.Â  Id at
795.Â  USAA paid the policy limits to Paula, but American Liberty refused
payment based on an Âother insuranceÂ provision in its policy.Â  Id.Â  The Supreme Court held that a provision may not ÂÂlimit the recovery of actual
damages caused by an uninsured motorist:Â

The statute does not expressly or by any
reasonable inference limit the recovery of actual damages to the
statutory limits of required coverage for one policy in circumstances where the
conditions to liability are present with respect to two policies with different
insurers and insureds. This is the effect, however, of Âother insuranceÂ
clauses, whether in the form of Âpro-rata,Â Âexcess insurance,Â Âexcess-escapeÂ
or like clauses; one or the other insurer escapes liability, or both reduce
their liability.

Â 

Id. at 797.Â  The Court further held that Âto permit
one policy, or the other, to be reduced or rendered ineffective by a liability
limiting clause would be to frustrate the insurance benefits which the statute
sought to guarantee and which were purchased by the respective insureds.ÂÂ  Id.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  In Briggs, Thomas and JoJean Briggs
suffered injuries while riding in a vehicle belonging to their employer.Â  See
514 S.W.2d at 234.Â  The employer carried insurance with International Insurance
Company and the Briggs carried insurance with American Motorists Insurance
Company.Â  Id.Â  Both policies contained Âother insuranceÂ provisions.Â  Id.Â  The Briggs settled with International and won a judgment against American.Â  Id.Â  The Supreme Court held:

[W]henever coverage exists under the uninsured
motorist endorsement, the person covered has a cause of action on the policy
for his actual damages to the extent of the policy limits without regard to the
existence of other insurance. If coverage exists under two or more policies,
liability on the policies is joint and several to the extent of plaintiffÂs
actual damages, subject to the qualification that no insurer may be required to
pay in excess of its policy limits.

Â 

Id. at 236.Â  

In Stracener, the Supreme Court considered
two cases involving the stacking of underinsured benefits.Â  See 777
S.W.2d at 379-81.Â  In the first case, LaDonna
Stracener was killed when the car in which she was riding was struck by a
vehicle driven by Robert Lampe.Â  Id. at 380.Â  Stracener was covered by four insurance policies issued by different insurers.Â 
 Id.Â  All the insurers settled, except USAA.Â  Id.Â  The First Court held that the
Straceners could not Âcombine or ÂstackÂ the limits of underinsured motorist
coverage under four separate insurance policies.ÂÂ  Id. at 379.Â  In the
second case, Scott Hestilow was injured when the car he was driving was struck
by a vehicle driven by Alvino Casarez.Â  Id. at 380.Â  A settlement was
reached with CasarezÂs insurance carrier.Â  Id.Â  ScottÂs parents each
carried a policy with USAA.Â  Id.Â  The Fourth Court held that Âcoverage
may be stacked,Â but the Âtotal coverage available to the beneficiary should be
reduced by the limit of the tortfeasorÂs liability coverage.ÂÂ  Id. at 379.Â  Both Stracener and Hestilow
involved clauses stating that the Âlimit
of liability shall be reduced by the amount recovered or recoverable from, or
on behalf of the owner or operator of an underinsured motor vehicle.ÂÂ  Id. at 380. Â The Supreme Court reversed Stracener and affirmed Hestilow,
holding that Âclauses in insurance policies which are not consistent with and
do not further the purpose of article 5.06-1 [the uninsured/underinsured
motorist statute] are invalid.ÂÂ  Id. at 384.

Â Â Â Â Â Â Â Â Â Â Â  Progressive attempts to distinguish Stracener,
Briggs, Ranzau, and Gatlin, arguing that they do not
address Âtwo policies from the same insurer issued to the same
named insured with injuries based on one accident.ÂÂ  Progressive points to
language in Ranzau stating that the uninsured/underinsured statute does
not limit the recovery for actual damages Âwhere the conditions to liability are present with respect to two
policies with different insurers and insuredsÂ and that Âother
insuranceÂ clauses allow Âone or the other insurerÂ to escape or Âreduce
their liability.ÂÂ  481 S.W.2d at 797
(emphasis added).

Â  Â Â Â Â Â Â Â Â Â  We are not persuaded that this
distinction affects our analysis.Â  In United Services Automobile AssÂn. v.
Hestilow, one of the cases addressed in Stracener, the San Antonio Court addressed a similar issue, holding that the fact that the Âinsurance carrier is the same for the two separate policiesÂ is irrelevant
because:

This is no different than had one of the policies
been issued by a different insurance carrier. By allowing USAA to offset
against each of its policies the amount paid by the underinsured motoristÂs
carrier, USAA would be receiving a double setoff, or a windfall. The insurance
company collected premiums on statutorily required insurance coverage. To
permit it to deny recovery under one of its policies would mean it profited under
the statute to the insuredÂs detriment. Such cannot possibly have been the
intention of the Legislature. 

Â 

754 S.W.2d 754, 758-59 (Tex. App.ÂSan Antonio
1988), aff'd, 777 S.W.2d 378 (Tex. 1989)
(internal citations omitted). Â In Travelers
Indemnity Co. v. Lucas, the Lucases suffered injuries when the ambulance in
which they were riding was struck by an uninsured motorist.Â  See 678
S.W.2d 732, 733 (Tex. App.ÂTexarkana 1984, no writ).Â Â The Lucases sought
personal injury protection and uninsured motorist coverage under their two
policies with Travelers.Â  Id.Â  Travelers paid the P.I.P. benefits under
one policy, but refused to pay under the other policy.Â  Id. at 733-34.Â 
The Texarkana Court held:

An insurance company may not reduce its U.M.
liability to an amount less than the policy limit by crediting to itself an
amount paid under another policy. The Lucases are entitled to recover the U.M.
coverage limits to the extent it does not exceed their actual damages.

Â 

Id. at 735 (internal citations omitted).

Â Â Â Â Â Â Â Â Â Â Â  Neither are we convinced that it
matters whether injuries arise out of Âone accident.ÂÂ  ÂTexas has
traditionally permitted stacking of uninsured motorist coverage when different
policies apply to the same
accident.Â
Â Hestilow, 754 S.W.2d at 757 (emphasis added).Â  Furthermore,
the statute expressly defines an Âunderinsured motor vehicleÂ in the context of
a single accident:

The term Âunderinsured motor vehicleÂ means an
insured motor vehicle on which there is valid and collectible liability
insurance coverage with limits of liability for the owner or operator which
were originally lower than, or have been reduced by payment of claims arising from
the same accident to, an amount less than the limit of liability stated
in the underinsured coverage of the insuredÂs policy.Â  

Â 

Act of May 6, 1977, 65th Leg., R.S., ch. 182, 1977
Tex. Gen. Laws 370, repealed by Act
of May 24, 2005, 79th Leg., R.S., ch. 727, Â§ 18, 2005 Tex. Gen. Laws 1752,
2186-87 (current version at Tex. Ins.
Code Ann. Â§ 1952.103 (Vernon 2007)) (emphasis added). Â In light of these authorities, we conclude that
multiple policies may be stacked even though issued by the same insurer to the
same insured for damages arising out of the same accident.Â  See Hestilow,
754 S.W.2d at 757-59; see also Lucas, 678 S.W.2d at 735.

Â Â Â Â Â Â Â Â Â Â Â  Progressive next argues that the ÂTwo or More Auto PoliciesÂ provision does not: (1) Âlimit an insuredÂs ability to recover an
amount in excess of the policy limitsÂ required by the statute; (2) Ârestrict
the [statuteÂs] effect;Â (3) Ârender Progressive an excess insurer (as in
Âother insuranceÂ clauses) wherein the benefits paid to the insured are
dependent upon the benefits received by the insured from a separate insurer;Â
or (4) give rise to the ÂuncertaintiesÂ of Âother insuranceÂ clauses as
identified in Stracener.[6]Â  See 777 S.W.2d 378Â at 383 (ÂuncertaintiesÂ
include the limits of underinsured motorist
coverage, Âthe limits of the tortfeasorÂs liability insurance, the extent of
damages suffered by any other persons who may have been involved in the same
accident and the amount of any settlements made with the liability insurance
carrierÂ).Â  According to Progressive, this clause is an
anti-stacking provision that allows an insured to recover Âactual damages in an amount for which the insured
contracted with full disclosure of all terms of the applicable policy.ÂÂ  Thus, Progressive argues that the underinsured limits
available to Kelley Âin the event of a single accident were disclosed at the
time Mr. Kelley purchased the policies.Â


Â Â Â Â Â Â Â Â Â Â Â  However, the proper inquiry is whether a provision limits the insuredÂs ability to recover the extent of her actual
damages incurred, not whether a provision limits an insuredÂs Âactual damages in an amount for which the insured
contracted.ÂÂ  See Stracener, 777 S.W.2d at 383; see also Briggs, 514 S.W.2d at 236;
Ranzau, 481 S.W.2d at 797.Â  Regardless
of whether it qualifies as an Âother insuranceÂ clause, an anti-stacking
clause, or some other type of clause, the ÂTwo or More Auto PoliciesÂ provision
may not be used to frustrate the
intended purpose of the statute.Â  See Stracener, 777 S.W.2d at 384 (Âclauses in insurance policies which are not
consistent with and do not further the purpose of article 5.06-1 are invalidÂ).

Â Â Â Â Â Â Â Â Â Â Â  Although Texas law allows an insured
to stack two or more policies to the extent of the insuredÂs actual damages, ProgressiveÂs ÂTwo or More Auto PoliciesÂ provision
effectively prohibits the stacking of multiple policies.Â  See id. at 382-83; see also Briggs, 514 S.W.2d at 236.Â  In doing so, this clause improperly inhibits the
injured insuredÂs ability to recover actual damages.Â  See Ranzau, 481
S.W.2d at 797.Â  This frustrates the very purpose of the statute.Â  See
Stracener, 777 S.W.2d at 383-84; see also Jankowiak, 201 S.W.3d at
212 (finding Âlimiting provisionsÂ invalid to the extent they Âprovide less than the statutory minimum amount of
coverageÂ or Âlimit a covered personÂs recovery of actual damagesÂ).Â  Accordingly, we conclude that the ÂTwo or More
Auto PoliciesÂ clause is inconsistent with the uninsured/underinsured motorist statute and is invalid.Â  See Stracener, 777 S.W.2d at 384; see
also Jankowiak, 201 S.W.3d at 212.Â  KelleyÂs second issue is sustained.

Conclusion

Â Â Â Â Â Â Â Â Â Â Â  Because Kelley has established as a
matter of law that Progressive issued two separate policies of insurance and
that ProgressiveÂs ÂTwo or More Auto PoliciesÂ provision violates public
policy, we reverse the trial courtÂs judgment and render judgment that Kelley
is entitled to recover under the second policy to the extent of her 
actual damages.Â  We remand this cause
to the trial court for further proceedings consistent with this opinion.

Â 

FELIPE REYNA

Justice

Â 

Before Chief Justice
Gray,Â Â Â Â Â Â  

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray dissents without a separate opinion)

Reversed and rendered in
part, 

Reversed and remanded in
part 

Opinion delivered and
filed December 12, 2007

[CV06]









[1] Â Â Â Â Â Â Â Â Â Â Â Â Â  Kelley alleges that she has
suffered over $1,000,000 in damages.





[2] Â Â Â Â Â Â Â Â Â Â Â Â Â  The First Court accepted this
contention for the sake of argument, but noted that the separate declaration
sheets appeared to be a single document.Â  See Monroe v. GovÂt Employees Ins.
Co., 845 S.W.2d 394, 398 n.6 (Tex. App.ÂHouston [1stÂ Dist.] 1992, writ
denied).Â Â Â 


Â 





[3] Â Â Â Â Â Â Â Â Â Â Â Â Â  Progressive attached an excerpt
from its ÂProduct & Underwriting GuideÂ to its response to KelleyÂs motion
for summary judgment.

Â 





[4] Â Â Â Â Â Â Â Â Â Â Â Â Â  The uninsured
motorist statute was enacted in 1967 to provide uninsured protection and
amended in 1977 to provide both uninsured and underinsured protection. Â See Act
of May 3, 1967, 60th Leg., R.S., ch. 202, Â§ 1, 1967 Tex. Gen. Laws 448, amended
by Act of May 6, 1977, 65th Leg., R.S., ch. 182, Â§ 1, 1977 Tex Gen. Laws
370, repealed by Act
of May 24, 2005, 79th Leg., R.S., ch. 727, Â§ 18, 2005 Tex. Gen. Laws 1752,
2186-87 (current version at Tex. Ins.
Code Ann. Â§Â§ 1952.101-1952.110 (Vernon 2007)).Â  These provisions were repealed
effective April 1, 2007.Â  See Act of May 24, 2005, 79th Leg., R.S., ch. 727, Â§ 18, 2005
 Tex. Gen. Laws 1752, 2186-87.Â  Because this case was filed in 2005, we apply the law in effect at
that time.





[5] Â Â Â Â Â Â Â Â Â Â Â Â Â  Kelley also relies
on a Montana case.Â  See Hardy v. Progressive Specialty Ins. Co., 67 P.3d
892 (Mont. 2003).Â  Because Hardy addresses a Montana statute and Montana public policy, we do consider it.





[6] Â Â Â Â Â Â Â Â Â Â Â Â Â  Progressive points out that the
ÂTwo or More Auto PoliciesÂ provision is separate from the Âother insuranceÂ clause in the policy. Â An Âother insuranceÂ clause is contained
elsewhere in the policy:

Â 

If there is other applicable liability insurance,
we will pay only our share of the loss.Â  Our share is the proportion that our
limit of liability bears to the total of all applicable limits.

Â 

We accept that these two clauses are not one and
the same.