

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00019-CV

_____

IN THE INTEREST OF A.D.K., C.D.K., AND J.Z.K, CHILDREN

_____

On Appeal from the 62nd District Court
Lamar County, Texas
Trial Court No. 86752

_____

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

A Lamar County District Court terminated the parental rights of Mother and Father to their three minor children, Aaron, Charles, and Jeff.[1] On appeal, Father contends that (1) termination was not in the children's best interest and (2) the trial court erred in admitting hearsay evidence regarding the children's statements about where they wanted to live. [2]

We affirm the trial court's order because (1) the evidence is legally and factually sufficient to support the trial court's determination that termination of Father's parental rights was in the children's best interest and (2) Father failed to preserve the hearsay error raised on appeal.

## I.    Factual and Procedural Background

In 2017, the Texas Department of Family and Protective Services (the Department) placed Mother and Father's three children, Aaron, Charles and Jeff, in foster care and initiated the present case seeking termination of Mother's and Father's parental rights. The trial court ordered Mother and Father to complete a family service plan that included parenting classes, counseling, and drug testing. In August 2017, Mother voluntarily relinquished her parental rights to the three children. The Department then proceeded with the termination case against Father.

Even though Mother had no further involvement in the case and did not appear at trial, it is undisputed that Father completed the court-ordered service plan, including all required counseling, classes, and drug testing. Father also visited the children six times during the pendency

---

[1]To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b)(1), (2).

[2]Mother's rights were also terminated, but she waived service, did not appear for the termination hearing, and is not a part of this appeal.

of the case, having chosen to see them on a monthly, rather than weekly, basis. However, Kelly Meredith, the Department case worker assigned to this case, testified that the Department continued to seek termination of his parental rights because Father could not successfully take care of the children due to his history of drug and alcohol abuse and dangerous and neglectful parenting decisions.

Mother and Father had a significant history with the Department. The police and the Department had previously investigated Mother and Father several times for physical and domestic abuse. Meredith testified that Charles and Aaron described seeing Mother and Father fight at various times and seeing Father "take [Mother's] keys after hitting her and both of them going to jail." Father admitted that the children had seen them argue, but he denied that any domestic violence occurred between them.

The children were previously removed from the parents' care and custody in October 2015, when Mother and Father were found passed out in their car at a Burger King. At that time, synthetic marihuana was found in the car, and the children were running around the area unsupervised. Father claimed that they "had stopped to take a nap," but he admitted that the situation had been dangerous for the children, who were all younger than four years old at the time. Due to the incident, the Department took custody of the children, and Mother and Father both were later convicted of endangering a child. However, in June 2016, the Department's case was dismissed, and the children were returned to the care and custody of Mother and Father.

At trial, Father admitted that he had a drug and alcohol problem in the past, but he completed substance abuse counseling and passed the approximately twenty drug and alcohol tests

he was given during the pendency of this case. He testified that he went to a substance abuse felony punishment (SAFP) facility in November 2017, and he completed the program in six months. After completing his court-ordered services, Father continued to attend counseling and Alcoholics Anonymous meetings.

Father also admitted to having a lengthy criminal history. His prior convictions in Texas included (1) a 2016 state-jail felony conviction for abandoning or endangering a child, (2) a 2017 third-degree felony conviction for tampering with or fabricating evidence, and (3) four class B misdemeanor convictions in 2017 for driving while intoxicated, resisting arrest, striking a highway fixture, and possessing a controlled substance. Father admitted that he had also been previously convicted in Oklahoma for assault and battery, driving under the influence, and assault on a pregnant woman. He also admitted that he had made "a lot of mistakes" and that it would not surprise him if the children were disappointed in him.

The children's attorney at litem, Deborah Wymore, testified that the children were warm and loving when they were in foster care in 2015, but they also "fought constantly," smeared feces on the walls of the foster home, spit on others, and tried to run away. They were subsequently reunited with Mother and Father, but returned to foster care in August 2017. After their return to foster care, Wymore observed that "they just went downhill" during the time they had spent with their parents between removals. Specifically, Aaron had developed a physical tic and was diagnosed with attention deficit hyperactivity disorder (ADHD), Charles was diagnosed with ADHD, psychosis, and was considered a slow learner, and Jeff was diagnosed with a form of autism called Asperger Syndrome, had dysregulation disorder, had a speech impediment, and was

4

also considered a slow learner. All three children received counseling and therapy and, due to their behavioral and disciplinary issues, were on behavior plans at school.

Jeff was prescribed medications to treat his autism, ADHD, and anxiety. He was hospitalized for mental issues three or four times after he attacked various men, severely bit a teacher's finger, and hit other teachers in the face. Charles heard voices, and once, the voices told him to attack a girl on the playground and choke her to the ground. He also talked about harming his brother and others, and his foster parents locked away their household knives and sharp objects so that Charles would not hurt himself or others.

Meredith testified that both Jeff and Charles told her that Father had taught them how to fight. Charles told Meredith and Jeff told Wymore that Father would invite his friends over and have the children fight in front of them—an allegation that Father denied. When Meredith told Charles that it would not be appropriate for him to live with Jeff, the child asked if it was because he and Jeff beat on each other all the time. When Meredith responded in the affirmative, Charles "would stress again that they were taught to do that and shown how to fight with one another."

The children had to be placed in separate foster homes because Jeff was very aggressive and kept trying to beat up Charles. Jeff would punch and kick Charles, and he would throw him to the ground and put him in headlocks and chokeholds. Jeff thought it was funny that he and Charles fought so much, and Meredith testified that Jeff "still gets worked up when he sees his brothers. He still talks about wanting to fight his brothers." A sibling visit after they were placed into foster care was terminated after ten minutes because Charles and Jeff were swinging toys at each other's heads and wanting to fight.

5

Wymore testified that, regardless of whether the children could be adopted or not, termination was in the children's best interest because Father could not meet the children's needs. She also testified that the children had "excelled since being in [Department] custody." Wymore and Meredith testified that the children's foster mother during the 2015 removal wanted to adopt all three children once she got her foster license reestablished. Jeff's former foster mother was interested in adopting him if the option became available, and Charles' and Aaron's current foster parents knew of a family member who had expressed interest in adopting them.

The trial court entered an order terminating Father's parental rights to the children, because, (1) under subsection (D) of Section 161.001(b)(1) of the Texas Family Code, he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) under subsection (E), he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being; (3) under subsection (L), he had been convicted of or placed on community supervision for the death or serious injury of a child; and (4) termination was in the children's best interest. The trial court also terminated Mother's rights to the children based on several predicate grounds and a finding that termination was in the children's best interest. Father filed this appeal.

**II.  Was There Sufficient Evidence that Termination Was in the Children's Best Interests?**

In his first point of error, Father argues that there is legally and factually insufficient evidence that termination was in the children's best interest.[3]

**A.    Standard of Review**

"The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).  "Indeed, parents have a fundamental right to make decisions concerning '"the care, custody, and control of their children."'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial."  *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)).  "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'"  *Id.* at 919–20 (quoting *A.B.*, 437 S.W.3d at 500).  "[I]nvoluntary termination statutes are strictly construed in favor of the parent."  *Id.* at 920 (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest."  *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)).  "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of

---

[3]Father does not challenge the sufficiency of the evidence supporting the predicate grounds for termination of his parental rights.

the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "This standard of proof necessarily affects our review of the evidence." *Id.*

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.). (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interest of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that" termination of the parent-child relationship was in the best interest of the child.

8

*L.E.S.*, 471 S.W.3d at 920 (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (quoting *C.H.*, 89 S.W.3d at 25); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'"" *Id.* (quoting *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'"" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical

9

interests must not be sacrificed merely to preserve parental rights." *Id*. (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

### B. Analysis of the *Holley Factors*

The first *Holley* factor involves the desires of the children. At the time of trial, Aaron and Charles were seven years old, and Jeff would turn six years old the day after trial. Absent a showing that the children are sufficiently mature, this factor is generally held to be neutral. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *In re E.R.*, No. 01-17-00503-CV, 2017 WL 5892402, at *11 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.) (fact-finder may consider child's fear of parent in best-interest determination). Wymore testified, "[I]f their dad asks them [if they want to live with him,] they will absolutely tell you yes." However, both Wymore and Meredith testified that the children did not want to live with Father because they were afraid of him. Therefore, this factor weighs in favor of termination.

As for the second, third, and sixth *Holley* factors, the record reflects that the children have significant mental, behavioral, and developmental needs that are being treated through medication, counseling, and separation. While Father did not deny that the children had substantial needs, there was compelling evidence that he failed to take their needs seriously, as he claimed that they were "typical boys," just "a little slower." He told Meredith that there was "nothing wrong with them," that the children were merely "acting out" and "trying to gain attention," and that they would "be fine" as soon as they came home. Upon regaining custody of the children, Father planned to take them to a local My Health, My Resources provider[4] in order to find "out what's

---

[4]My Health, My Resources is a provider of mental health and intellectual and developmental disability services.

the real issue going on with [the] kids." Father testified that while he would not take the children off of their medications, he would like to wean the children off of their medications, and he would speak with a doctor about it because "every doctor sees something different." Meredith testified that Charles "would possibly cause serious harm to himself or somebody else" if he were taken off or weaned off his medications.

While Father denied the presence of any domestic violence between Mother and him, two of the children described seeing Father hit Mother and take away her car keys. Father also has a history of drug and alcohol abuse, a prior conviction for endangering his children, and multiple prior convictions for driving under the influence and assault, and the trial court could have inferred that similar conduct was likely to recur in the future if the children were returned to his care. *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *In re J.A.P.*, No. 06-08-00092-CV, 2009 WL 839953, at \*3 (Tex. App.—Texarkana Apr. 1, 2009, no pet.) (mem. op.) (finding that history of assault should be considered in determining best interest). Even though Father completed SAFP and passed his drug and alcohol tests, a fact-finder is "not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

In this case, the trial court found that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; father did not challenge this finding. *See C.H.*, 89 S.W.3d at 26 (unchallenged

11

endangerment findings can support best-interest finding). From this evidence, the trial court could have found that Father could not adequately provide for the children's needs and that his failure to take the children's mental and behavioral issues seriously enough presented a danger to them. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (considering parent's history of irresponsible choices in best interest determination). Therefore, the second, third, and sixth factors weigh in favor of termination.

The fourth and fifth factors consider Father's parental abilities and the programs available to assist him. The Department has several programs to assist Father, and while he completed his court-ordered service plan, the evidence indicates that Father failed or refused to utilize and apply the lessons and tools he obtained therefrom. Father purportedly completed a prior service plan and parenting classes stemming from the October 2015 removal, but despite this advantage, the children "went downhill" after they were returned to his care. After the most recent removal, Father told Meredith that he did not think he would "get anything out of [the services]."

During his last visit with the children, Father failed to correct Jeff when he hit Aaron in the head with a toy, and when Meredith asked him to address the issue, Father told Aaron, rather than Jeff, that they "had to behave" and should not hit each other. While Father spoke with Aaron, Jeff promptly began hitting Charles with the toy, forcing Meredith to correct Jeff and take the toy away from him. From this evidence, the trial court could have determined that Father lacks either sufficient parenting abilities or the will to use them. *See Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.) (finding that best-interest evidence includes parent's lack of

motivation to improve parenting skills). Accordingly, the fourth and fifth factors weigh in favor of termination.

The seventh factor relates to the stability of the home. Stability and permanence are paramount in the upbringing of a child. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). At the time of trial, Father lived in a rented, two-bedroom house, owned an automobile, and maintained full-time employment at Metro Gate & Manufacturing, in addition to working a second job at Cattleman's Livestock Commission on some weekends. However, he had only been in his home for four months, and he had changed jobs two months prior to trial. Due to Father's pattern of alcohol abuse, violence, and incarceration, he was frequently absent from the home and was in jail at the time Mother relinquished the children to the Department. In contrast, Wymore testified that the children had "excelled since being in [Department] custody" and that the children's former foster mother was "a very serious option" to adopt all three of them. Accordingly, this factor weighs in favor of termination.

The eighth *Holley* factor considers acts or omissions of the parent that may indicate that the current parent-child relationship is not a proper one. The record reflects that the children were physically aggressive, particularly Jeff and Charles. The trial court could have determined that the parent-child relationship in this case was not a proper one because, according to Jeff and Charles, Father taught them how to fight and would invite friends over so the children could fight in front of them. Therefore, this factor weighs in favor of termination.

In light of a full evaluation of Father's circumstances, the reasons for terminating his parental rights, and a balancing of the *Holley* factors, we find that the evidence was both legally

13

and factually sufficient to support the trial court's best-interest findings. Thus, we overrule Father's first point of error.

### III. Did the Trial Court Err in Admitting Hearsay Evidence?

In his final point of error, Father contends that the trial court erred in allowing Meredith and Wymore to testify to "statements of the children regarding where they desired to live."

On direct examination, the Department asked Meredith, "Have the children talked to you or told you about their father directing them to fight?" Father objected, on hearsay grounds, arguing that he had "no way to cross examine to find out the circumstances" of the children's out-of-court statements. The trial court overruled his objection, and the Department further inquired about what the children told her regarding "their father directing them to fight." In response, Meredith testified that the children had described seeing Mother and Father fight at various times, seeing Father take Mother's keys after hitting her, and seeing both of them go to jail. Prior to any further testimony, the trial court interjected:

> THE COURT: Let me interrupt you, [Department]. As far as [Father's] objection goes regarding hearsay, the Court is going to consider that -- allowing a running objection to all --
>
> FATHER: Thank you. I didn't want to --
>
> THE COURT: I appreciate it. I just want to make sure -- if I'm wrong I am wrong. If I'm right -- I'd just like a good record going forward. I hate to interrupt. Please proceed.

Four questions later, the following colloquy occurred:

> Q. . . . Have you talked to the children about their -- whether they desire to go with their dad?

14

A.	I've talked to them about where they would like to live, if they could choose.

Q.	What have they told you?

A.	They have told me they would prefer to live with their Mimi and have visitations with their father. They do not want to return home to their father.

Later in the trial, during its examination of Wymore, the Department asked her if the "children want[ed] to go live with their father," and Wymore responded, "No, they don't." Father contends that the trial court erred in admitting, through Meredith and Wymore, hearsay statements of the children regarding where they wanted to live.

The Department contends that Father failed to preserve this issue. In order to preserve a complaint for our review, the action or omission which is alleged as error or abuse of discretion on behalf of the trial court must have been the basis of a timely request, objection, or motion that specified the action that the trial court was requested to take, or to forbear from taking, and an adverse ruling must have been obtained. TEX. R. APP. P. 33.1(a); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam). Father did not raise an objection at the time Meredith or Wymore testified to the children's statements regarding where they desired to live. However, Father argues that the trial court granted him a running objection that preserved this error for appeal.

Running objections are an exception to the general rule that a party must continue to object and get a ruling for each individual instance of inadmissible testimony. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (citing *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991); *In re A.P.*, 42 S.W.3d 248, 261 (Tex. App.—Waco 2001, pet. denied),

15

*overruled on other grounds by In re A.M.*, 385 S.W.3d 74 (Tex. App.—Waco 2012, pet. denied). "A running objection is required to be specific and unambiguous." *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 203 (Tex. App.—Texarkana 2000, pet. denied). Such an objection should "not encompass too broad a reach of subject matter over too broad a time." *Ethington*, 819 S.W.2d at 859.

Even though the trial court sua sponte granted Father a running objection, the record is unclear regarding the scope of the objection granted. *See Huckaby*, 20 S.W.3d at 203. We conclude that, due to the objection's context and the timing of the court's ruling, the running objection was, at best, restricted to the children's out-of-ourt statements regarding what they told Meredith about their father directing them to fight and about seeing and experiencing domestic violence. We are not free to assume that the court granted Father a running objection to any witness testifying to any of the children's out-of-court statements regarding any subject, because not all such statements are necessarily hearsay, and it is the parties' responsibility to make specific objections and ensure that the record reflects the scope and subject matter of the court's ruling on those objections. *See id.* Therefore, Father failed to object to Meredith or Wymore testifying to the children's statements regarding where they wanted to live. Accordingly, this issue was not preserved for our review. *See* TEX. R. APP. P. 33.1(a).

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:     May 15, 2019
Date Decided:       June 26, 2019

16